UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-10185
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MARCUS MORGAN, also known as Red;
RYAN JACKSON, also known as Anthony, also known as Tony;
JARVIS WRIGHT, also known as Jaye,

Defendants-Appellants.

_____

Appeals from the United States District Court for the
Northern District of Texas
_____
July 15, 1997

Before REAVLEY, JOLLY, and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

This direct criminal appeal involves three appellants who were convicted of numerous drug-related offenses. Appellants raise various challenges to the sufficiency of the evidence, evidentiary rulings, and their sentences. Finding no reversible error, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

The narcotics conspiracy and related convictions in this case result from an undercover Federal Bureau of Investigation ("FBI") operation in Dallas, Texas. FBI Agent Donna Brown and Officer Mark

Webster of the Dallas Police Department conducted an undercover operation in the Frazier Courts area in Dallas. Agent Brown and Officer Webster infiltrated the area and made numerous undercover purchases of crack cocaine, many of which were recorded on audiotape and/or videotape.[1] As a result of their undercover efforts, a grand jury returned a 49-count indictment against 24 defendants. All 24 defendants were charged with conspiracy to distribute cocaine between December 1, 1994 and August 8, 1995, and many were charged with other offenses as well. The three appellants in this case were tried together.

Appellant Marcus Morgan was charged with conspiracy to distribute cocaine base (21 U.S.C. § 846), two counts of maintaining a building for the purpose of distributing cocaine base (21 U.S.C. § 856(a)(1)) and aiding and abetting the same (18 U.S.C. § 2), employment of a minor to assist in drug trafficking (21 U.S.C. §§ 861(a)(1)) and aiding and abetting the same (18 U.S.C. § 2), three counts of distribution of cocaine base near a public school (21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), 860(a)) (one count included aiding and abetting, 18 U.S.C. § 2). On November 2, 1995, a jury returned a verdict of guilty on the conspiracy count and three counts of distribution of cocaine base near a school. The jury found Morgan not guilty on both counts of maintaining a place for distributing crack cocaine. The district court sentenced

---

[1] The facts are set out in greater detail as needed to review each appellant's sufficiency points.

2

Morgan to 240 months on each count to run concurrently and an eight-year term of supervised release.

Jarvis Wright was charged with conspiring to distribute cocaine base (21 U.S.C. § 846), maintaining a building for the purpose of distributing cocaine base (21 U.S.C. § 856(a)(1)) and aiding and abetting (18 U.S.C. § 2), and four counts of distributing cocaine base near a school (21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(iii), and 860(a)) and aiding and abetting (18 U.S.C. § 2). The jury returned a verdict of guilty on all six counts against Wright. The district court sentenced Wright to 240 months on each count to run concurrently and an eight-year term of supervised release.

Ryan Jackson was charged with conspiring to distribute cocaine base (21 U.S.C. § 846) and four counts of distributing cocaine base near a public school (21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), (B)(iii), and 860(a)) and aiding and abetting the same (18 U.S.C. § 2). He was convicted of all charges save one count of distributing or aiding and abetting the distribution of cocaine base near a school. The district court sentenced Jackson to 210 months on each count to run concurrently and five-, six-, and eight-year terms of supervised release to be served concurrently. The defendants timely filed notices of appeal.

Wright and Jackson seek to adopt by reference their co-appellants' briefs in their entirety. Federal Rule of Appellate Procedure 28(I) permits an appellant to "adopt by reference any part of the brief of another [appellant]." FED. R. APP. P. 28(I).

This circuit, however, has held that an appellant may not adopt by reference fact-specific challenges to his conviction. *See United States v. Alix*, 86 F.3d 429, 434 n.2 (5th Cir. 1996)(citations omitted). Thus, Jackson may not adopt Morgan's and Wright's challenges to the sufficiency of the evidence, nor may Wright adopt Morgan's and Jackson's challenges to the district court's application of the sentencing guidelines. *See id.* (noting that sufficiency and sentencing challenges may not be adopted by reference). The government does not challenge Wright's adoption of Morgan's and Jackson's argument that there was a material variance between the indictment and the proof at trial.

### DISCUSSION

### I. Sufficiency of the Evidence

In reviewing the sufficiency of the evidence to support a jury verdict, we determine whether, viewing the evidence and the inferences that may be drawn from it in the light most favorable to the verdict, a rational jury could have found the essential elements of the offense beyond a reasonable doubt. *United States v. Sneed*, 63 F.3d 381, 385 (5th Cir. 1995) (citing *United States v. Pruneda-Gonzalez*, 953 F.2d 190, 193 (5th Cir.), *cert. denied sub nom. Polley v. United States*, 504 U.S. 978, 112 S. Ct. 2952 (1992)), *cert. denied*, 116 S. Ct. 712 (1996).

### A. Conspiracy (Wright and Morgan)

Both Morgan and Wright challenge their conspiracy convictions on the grounds of insufficient evidence. To establish a drug conspiracy in violation of 21 U.S.C. § 846, the government must

**4**

prove beyond a reasonable doubt that (1) an agreement existed to violate narcotics laws, (2) the defendant knew of the agreement, and (3) the defendant voluntarily participated in it. *United States v. Misher*, 99 F.3d 664, 667 (5th Cir. 1996) (citation omitted), *petition for cert. filed*, No. 96-1983 (Mar. 17, 1997)(citations omitted). The jury may infer any element of the conspiracy from circumstantial evidence. *United States v. Inocencio*, 40 F.3d 716, 725 (5th Cir. 1994)(citations omitted); *Misher*, 99 F.3d at 668 (citations omitted). Moreover, a conspiracy conviction can rest solely on the uncorroborated testimony of an accomplice if the testimony is not on its face insubstantial. *United States v. Gibson*, 55 F.3d 173, 181 (5th Cir. 1995) (citing *United States v. Gardea Carrasco*, 830 F.2d 41, 44 (5th Cir. 1987)).

Melvin Ammons, John Stuart, and Johnny Robinson testified that they had an agreement to distribute crack cocaine in the Frazier Courts area. The record shows that Ammons, Stuart, and Robinson occupied one of the top rungs of the drug-dealing ladder in this area. Ammons bought cocaine in Dallas and Los Angeles for distribution in the Frazier Courts area. Stuart and Robinson sold crack from Ammons's duplex on Frank Street. Andre Rogers was another key player who appears to have occupied an intermediate rung. Rogers employed appellant Jackson, bought crack from Ammons, Stuart, and Robinson, and sold crack to Jackson, Morgan, and Wright.

The record also supports an inference that Frazier Courts was a protected territory for the distribution of crack cocaine; that

is, dealers in the area would not allow just anyone to sell crack cocaine in the area. Dealers were equally choosy about their clientele. Both Stuart and Rogers testified that they would not sell crack cocaine to someone they did not know. Agent Brown's and Officer Webster's testimony also bears this out: to make undercover purchases of crack cocaine, they had to have area residents involved in the drug scene introduce them to dealers.

1. Wright

The record in this case is suffcient to allow a reasonable jury to conclude beyond a reasonable doubt that Wright knew of and voluntarily participated in an agreement to distribute crack cocaine in the Frazier Courts area.

Wright made crack cocaine purchases from several of the key members of the Frazier Courts conspiracy. During 1995, Stuart sold and "fronted" crack (*i.e.*, allowed Wright to pay for crack with the proceeds of its sale to others) to Wright. Robinson also fronted crack to Wright. Wright twice attempted to purchase crack from Ammons "on consignment." Ammons testified that he refused because it was "common knowledge" that Wright was "working for" Stuart.[2] Wright also purchased crack from Andre Rogers.

---

[2] Wright apparently argues that a colloquy between the district court and Stuart at the sentencing hearing shows that the district court found Stuart to be a credible witness and that because Stuart testified that Wright did not work for him in 1995, Ammons's testimony to the contrary should have been discredited by the jury. Credibility issues are for the finder of fact and do not undermine the sufficiency of the evidence. *See United States v. Davis*, 61 F.3d 291, 297 (5th Cir. 1995), *cert. denied sub nom. Jefferson v. United States*, 116 S. Ct. 961 (1996)(citing *United States v. Bailey*, 444 U.S. 394, 414-15, 100 S. Ct. 624, 637 (1980)).

Wright did not purchase crack cocaine only for his personal use. Wright concedes that the government proved that he sold crack to Officer Webster on April 19, 1995, April 26, 1995, May 23, 1995, and July 18, 1995. The government also presented evidence that Wright distributed crack in the neighborhood.[3] According to Rogers, Wright once asked Rogers to let him "have a customer." Wright also referred Officer Webster to 2939 School Place, an apartment out of which he and his relatives Darren Choice and Shawntee Cherry sold drugs. When Officer Webster made a purchase of crack from Shawntee Cherry, Wright paged him. Officer Webster testified that Wright first asked him why he had purchased from Cherry, but then said "oh, well, it doesn't really matter, he works for me, it's all the same."

All these pieces of evidence, especially in light of other testimony that Frazier Courts was a protected area where only insiders could sell crack, are sufficient to support Wright's conspiracy conviction.

2. Morgan

The evidence of Morgan's participation in the crack-distribution conspiracy is sufficient as well. The record demonstrates that Morgan bought crack from Ammons, Stuart, and Robinson during 1995, made two crack sales to undercover officers

---

[3] Wright also argues that his affiliation with a gang could not be used to prove the conspiracy. This argument is frivolous. The government did not introduce evidence at trial of Wright's affiliation with the 415 Bloods, much less did it rely on that affiliation to prove conspiracy.

during the same period, and was aware of at least a tacit agreement between Ammons, Stuart, and Robinson.[4]

In March 1995, Morgan referred Officer Webster to Andre Rogers for the purchase of crack cocaine. Ammons testified that in May 1995, Morgan approached him to buy crack cocaine. He told Ammons that he was buying the crack because Rogers was no longer at his house at 2821/2823 Carter, but his customers were "still coming down there" so Morgan "wanted to make some money." It requires only a small and permissible inferential step to conclude that Morgan was taking over Rogers's role in distributing cocaine in that part of Frazier Courts.

On June 15, 1995, Morgan flagged Officer Webster down. Morgan told Officer Webster he was "back in power." Officer Webster then purchased crack cocaine from Morgan. During the purchase, Officer Webster saw numerous small baggies of crack in Morgan's car, further supporting the inference that Morgan was distributing crack in the area.

The record also contains strong evidence that Morgan knew of the agreement between Stuart, Ammons, and Robinson. Stuart twice sold crack cocaine to Morgan at Ammons's Frank Street duplex. On the first occasion, Morgan purchased approximately 7 grams of crack cocaine for $200. The next time, he purchased an ounce. Stuart testified that he tried to charge Morgan $450. Morgan apparently

---

[4] Morgan asserts that his first sale to Webster on January 9, 1995 was not evidence of his knowing participation in any conspiracy because Ammons, Stuart, and Robinson had not yet entered into an agreement at that time. Even without this sale, the evidence is sufficient to support Morgan's conviction.

had bought an ounce from Ammons for $400; Morgan protested to Stuart that "Sinky [Ammons] let me have them for 4." Stuart testified that he reduced the price to $400 "out of respect for the duplex [on Frank Street] and the business relationship we all had."

On another occasion in 1995, Morgan came to Ammons's residence to purchase crack cocaine. When Morgan arrived, Ammons and Robinson were cooking powder cocaine into crack cocaine. Ammons instructed Robinson to tell Morgan that it would be awhile before the crack was finished. When the crack was ready, Robinson delivered it to Morgan on Carter Street. Morgan bought approximately 60 grams of crack in this transaction alone.

Viewing the evidence in the light most favorable to the verdict, there is substantial evidence from which the jury could conclude that there was an agreement to sell crack cocaine in the Frazier Courts area and that Morgan was aware of and voluntarily participated in that agreement.

B.   Crackhouse Statute (Wright)

Wright challenges the sufficiency of the evidence to support his conviction under 21 U.S.C. § 856(a)(1) for maintaining a place for the distribution of a controlled substance or aiding and abetting the same.

A conviction under 21 U.S.C. § 856(a) (the "crackhouse statute") requires the government to show that the defendant (1) knowingly (2) opened or maintained a property (3) for the purpose of manufacturing, distributing, or using the drug. *Gibson*, 55 F.3d at 181. Only the second element is at issue in this case.

**9**

Although this circuit has previously encountered the "maintenance" element of Section 856(a)(1), the evidence presented in those cases allowed us to paint with a broader brush than the evidence in this case will permit. *See United States v. Roberts*, 913 F.2d 211 (5th Cir. 1990), *cert. denied sub nom. Preston v. United States*, 500 U.S. 955, 111 S. Ct. 2264 (1991); *United States v. Onick*, 889 F.2d 1425 (5th Cir. 1989), *en banc reh'g denied*, 894 F.2d 1335 (1990).[5]

During an undercover transaction on April 26, 1995, Wright told Officer Webster that he could also contact Darren Choice and Shawntee Cherry, Wright's relatives, at 2939 School Place to purchase narcotics. Wright called the School Place apartment "our spot" and gave Webster the address as "the place from which he sold his dope." That night Webster went to the address and bought crack from Cherry in the parking lot. Webster testified that Wright later told him that Shawntee Cherry "worked for him." Donald Greer, Wright's uncle and a co-defendant who pleaded guilty before trial, testified that Wright was known to sell drugs from "Shawn's house" on School Place "in the projects."

Two and a half months later, Webster returned to the apartment. When Webster entered, Wright was lying on the couch. Wright motioned Webster in and instructed an unidentified man "to go to the closet and remove a plastic bag . . . and deliver it to Mr. Wright." Wright then sold the crack to Webster. When the police searched 2939 School Place, they found a baggy containing

---

[5]     On several other occasions, we have considered the  "for the purpose of" element, *see Gibson*, 55 F.3d at 181; *United States v. Chen*, 913 F.2d 183, 187-90 (5th Cir. 1990).

crack, along with a plate and a razor blade, more baggies, and white powdery residue, although these items were not directly linked to Wright. The record does not contain evidence Wright paid rent for the apartment or that he lived in the apartment. The apartment lease was in the name of Charisee Choice, another of Wright's relatives. Wright argues that even if crack was distributed from the School Place apartment, there is no evidence that he "maintained" the apartment within the meaning of the statute.

Although neither *Roberts* nor *Onick* squarely controls our disposition here, we draw guidance from them. *Onick* offers several hints as to the meaning of maintenance. In *Onick*, the evidence showed that the defendant lived in the house he was found to have maintained. Papers found at the house showed that the defendant listed it as his home address; clothes found there were labeled with his nickname, and bottles of prescription medicines bore his name; and he "selected clothing from one of the closets to wear to the police station." 889 F.2d 1430. Based on this evidence, the court concluded that the defendant had "dominion and control" over the house, and thus had constructive possession of drugs in the house. *Id.* Against this factual backdrop, we held that "the jury could infer that Tolliver maintained the house because he lived there." *Id.* at 1431.[6]

---

[6] We reversed the conviction of another defendant in *Onick* who did not live at the house. *Id.* at 1431. We noted, however, that we did not "mean to suggest that living on the premises is either necessary or sufficient for conviction under this statute." 889 F.2d at 1431 n.2.

In *Roberts*, this court gave a clear signal that the constructive possession concepts of "dominion and control" are relevant to the maintenance inquiry. *Roberts*, 913 F.2d at 221. The evidence in *Roberts* was strong: the defendant "paid most of the rent" on the condominium; he attempted to "swap" the condominium for another place; he was present when the police searched the place and was heard "issuing orders to the condominium's occupants"; and a government informant had previously seen him "cutting cocaine" inside the residence. *Id.* From this evidence, the court concluded that the defendant "did exercise sufficient dominion and control" to support a finding that he "opened or maintained" the condominium. *Id.*

Both *Onick* and *Roberts* suggest that dominion and control over a place are relevant to showing maintenance. *See id.; Onick*, 889 F.2d at 1431. Other circuits have gone further and held that evidence of dominion and control over or constructive possession of a place is sufficient to support a maintenance finding. *See United States v. Basinger*, 60 F.3d 1400, 1405 (9th Cir. 1995); *United States v. Howell*, 31 F.3d 740, 741 (8th Cir. 1994).

We are wary of equating possession with maintenance by holding that any time the evidence would support a finding that the defendant was in constructive possession of a premises, the evidence would also support a conviction under the crackhouse statute when controlled substances are distributed from such premises. Indeed our opinion in *Roberts* suggests that not just any showing of dominion and control will suffice to support a

**12**

maintenance finding. We held that there was evidence that the defendant exercised "*sufficient* dominion and control" over the condominium, suggesting that dominion and control may fall short of maintenance. *Roberts*, 913 F.2d at 221 (emphasis added). We believe that the *Roberts* court properly qualified its holding. Congress could have, but did not, make it an offense to "possess" a place for the purpose of distributing controlled substances. "Maintain" connotes a degree of continuity and duration that is not an attribute of "possession."[7] *See United States v. Clavis*, 956 F.2d 1079, 1091 (11th Cir.)(listing duration and continuity as two factors to be taken into consideration in determining the maintenance issue), *cert. denied sub nom. Edwards v. United States*, 504 U.S. 990, 112 S. Ct. 2979 (1992), *modified on other grounds*, 977 F.2d 538 (11th Cir. 1992), *cert. denied*, 507 U.S. 998, 113 S. Ct. 1619 (1993).

   With this background in mind, we turn to whether there was sufficient evidence that Wright maintained the apartment on School Place. On one hand, the record is devoid of evidence that Wright lived at the apartment, leased the apartment, paid rent for the apartment, had such control over the apartment that he could lend it to others, or that the utilities or telephone service were in his name.

---

   [7]   *Compare* Webster's Ninth New Collegiate Dictionary 718 (1984) (defining to "maintain" as "to keep in an existing state: preserve from failure or decline; to sustain against opposition or danger: uphold and defend; to continue or persevere in: carry on, keep up) *with id.* at 918 (defining "possess" as "to instate as an owner . . . to have and hold as property).

**13**

On the other hand, the evidence demonstrates that Wright exercised some supervisory control over the apartment, shown by his instructions to the person who retrieved the crack from the closet and brought it to him and by the fact that Cherry, who lived in the apartment, worked for him. Supervisory control over the premises is one factor that this court has considered probative of "maintaining" a place. *See Roberts*, 913 F.2d at 221 (noting that the police heard the defendant giving orders to the occupants of the condominimum). The Eleventh Circuit has also recognized that acts of maintenance may include "supervising, protecting, [or] supplying food to those at the site . . . ." *Clavis*, 956 F.2d at 1091. Similarly, the Seventh Circuit in *dictum* emphasized that the statute "appears to be aimed, like the drug-kingpin statute, at persons who occupy a supervisory, managerial, or entrepreneurial role in a drug enterprise . . . ." *United States v. Thomas*, 956 F.2d 165, 166 (7th Cir. 1992)(citations omitted).

The question in this case is whether the slim evidence of supervisory control over the apartment, in combination with the other slender reeds upon which the government relies, is sufficient to show that Wright "maintained" the apartment.

Along with evidence that Wright exercised a supervisory role at the apartment, there is some evidence of the duration of Wright's connection with the apartment: at least two and a half months passed between when Wright referred Officer Webster to the apartment (calling it "our spot") and when Wright was in the apartment, selling crack to Officer Webster. There is also

**14**

evidence that Wright stored his crack in a closet at the apartment, which is not a common area.  *See Clavis*, 956 F.2d at 1092 (noting that items owned by defendant convicted under Section 856(a)(1) were found in a locked closet); *United States v. Williams*, 923 F.2d 1397, 1403-04 (10th Cir. 1990) (emphasizing the fact that items connected to the defendant were found in a closet), *cert. denied*, 500 U.S. 925, 111 S. Ct. 2033 (1991).

This case does not involve an isolated sale of crack from a location.  Rather, all the evidence is consistent with Wright having participated in the maintenance of a crackhouse.  Wright directed others to the crackhouse; called the location "our spot"; told Officer Webster that Cherry, who resided in the apartment, worked for him; and exercised dominion and control over the apartment by directing another person during a drug transaction and by storing his drugs in a closet in the apartment.  Although any of these facts might be insufficient in isolation, they coalesce to support the jury's finding here that Wright maintained 2939 School Place for the purpose of distributing crack cocaine in violation of Section 856(a)(1).

We emphasize that whether a defendant has "maintained" a place is necessarily a fact-intensive issue that must be resolved on a case-by-case basis.  In doing so, we must be mindful of the conditions under which crackhouse operations are often conducted. Drug dealers who maintain a location for the purpose of selling drugs may not avoid conviction under the crackhouse statute by simply ensuring that the lease or deed for the location and the

utilities, if any, are not in their name. *See, e.g.*, *United States v. Wood,* 57 F.3d 913, 919 (10th Cir. 1995); *Howell*, 31 F.3d at 741; *see also United States v. Lancaster*, 968 F.2d 1250, 1254 (D.C. Cir. 1992).

Where the evidence shows that over a period of time the defendant can direct the activities of and the people in a place, the jury may infer that he is involved in maintaining the place. Accordingly, we conclude that the evidence as a whole is sufficient to support the jury's finding that Wright maintained 2939 School Place for the purpose of distributing cocaine base.

C. Aiding and abetting the sale of crack cocaine near a public school (Morgan)

The jury convicted Morgan of Count 14, which charged that Morgan, Jackson, and Rogers aided and abetted each other in the possession and distribution of crack near a public school on March 10, 1995. The record shows that Morgan referred Officer Webster to Rogers at 2831/2823 Carter for the purchase of crack. Webster went to the Carter address and was met by Ryan Jackson, whom Webster knew from a previous sale. Webster and Jackson negotiated the sale, Jackson got baggies of crack from Rogers, and Jackson and Webster drove to another location to complete the sale.

Morgan appears to complain of his conviction because although he referred Webster to Rogers, Jackson actually handled the transaction. This argument is without merit. Aside from the fact that Rogers was in fact involved in the transaction, evidence at trial showed that Jackson worked for Rogers. This evidence is more than sufficient to support the conviction.

**16**

## II.  Variance

Morgan, Jackson, and Wright[8] argue that a fatal variance existed between the indictment, which alleged a single conspiracy, and the proof at trial, which they claim established the existence of two or more separate and independent conspiracies.  To prevail on a material variance claim, the appellants must prove (1) a variance between the indictment and the proof at trial, and (2) that the variance affected their substantial rights.  *United States v. Morris*, 46 F.3d 410, 414 (5th Cir.), *cert. denied*, 115 S. Ct. 2595 (1995).  Whether the evidence shows one or multiple conspiracies is a question of fact for the jury.  *United States v. Guerra-Marez*, 928 F.2d 665, 671 (5th Cir.)(citations omitted), *cert. denied*, 502 U.S. 917, 112 S. Ct. 322 (1991).  The principal considerations in counting the number of conspiracies proven are "(1) the existence of a common goal, (2) the nature of the scheme and (3) overlapping of participants in the various dealings."  *United States v. Faulkner*, 17 F.3d 745, 761 (5th Cir.), *reh'g denied en banc*, 21 F.3d 1110, *cert. denied*, 513 U.S. 870, 115 S. Ct. 193 (1994) (quoting *United States v. Richerson*, 833 F.2d 1147, 1153 (5th Cir. 1987)).  A jury's finding that the government proved a single conspiracy must be affirmed unless the evidence, viewed in the light most favorable to the government, would preclude reasonable jurors from finding a single conspiracy beyond a

---

[8]    The government does not contest Wright's adoption of this issue by reference.

reasonable doubt. *Morris*, 46 F.3d at 415 (citing *United States v. DeVarona*, 872 F.2d 114, 118 (5th Cir. 1989)).

This court has defined the "common goal" factor used to count conspiracies broadly. *Morris*, 46 F.3d at 415. In *Morris*, we held that the common goal of a single conspiracy was "to derive personal gain from the illicit business of buying and selling cocaine." *Id.* The jury could reasonably have concluded that the common goal of the charged conspiracy in this case was to distribute crack cocaine in the Frazier Courts area.

Both the nature of the scheme and the overlap of participants also support a single conspiracy in this case. A bird's eye view of the evidence presented at trial shows that Ammons, Stuart, and Robinson were "key men" who supplied crack cocaine to the Frazier Courts area. *See United States v. Pena-Rodriguez*, 110 F.3d 1120, 1127 (5th Cir. 1997), *petition for cert. filed*, No. 96-9480 (June 19, 1997); *Morris*, 46 F.3d at 416 (quoting *United States v. Richerson,* 833 F.2d 1147, 1154 (5th Cir.1987)(internal citations omitted)). Rogers, Wright, and Morgan acted as middle men, buying from Ammons, Stuart, and Robinson, and selling to area residents. Jackson worked for Rogers, who bought crack from Ammons and Stuart at the Frank Street duplex. The evidence also showed that Morgan referred business to Rogers. Viewed in the light most favorable to the verdict, the efforts of each were "necessary or advantageous . . . to the overall success of the venture . . . ." *Morris*, 46 F.3d at 417. The government made a strong showing that the sellers and

18

the mid-level purchasers had direct relationships and that there was overlap between the groups of distributors.

Jackson argues that the government proved two conspiracies: the Ammons-Stuart-Robinson conspiracy (the "charged conspiracy") and a conspiracy headed by Andre Carl Rogers.  Jackson also lists members of the charged conspiracy, including Ammons, Stuart, and Robinson, who were unaware that Jackson sold cocaine.  *Id.*  Of course, the fact that other participants in the charged conspiracy were unaware of Jackson's involvement in the overarching scheme does not preclude a finding that he was a part of the conspiracy.  *Morris*, 46 F.3d at 416 ("The government does not have to establish that the sellers and purchasers knew each other or knew what each other was doing.").  Jackson also relies on Rogers's testimony that his suppliers were not among those charged in the indictment and that some of the individuals who distributed for him were not charged.  Even if Rogers had other suppliers, the record is clear that Rogers purchased crack cocaine from Ammons and Stuart.  Further, the fact that some conspirators in Roger's line of distribution may have escaped indictment does not establish a separate conspiracy.

Morgan argues that the places at which the prosecution proved he sold crack cocaine differed from the locations at which co-conspirators were shown to distribute.  He also argues that Rogers was a competitor, not a part of the same conspiracy.  The fact that some participants in the scheme are in competition does not preclude a finding of a single conspiracy.  *See United States v.*

*Wilson*, ___ F.3d ___, 1997 WL 351805, *4 (5th Cir. June 26, 1997) (citations omitted); *Morris*, 46 F.3d at 416 (holding that competition among purchasers was just a part of the "larger common plan" to distribute drugs). As discussed in Section I.A.2 above, the evidence was sufficient to show that Morgan was involved in the overarching conspiracy.

Even were we to conclude that there was a variance, appellants have failed to prove that it affected their substantial rights. *See Guerra-Marez*, 928 F.2d at 672. The evidence is sufficient to prove each appellant's participation in at least one conspiracy, and none has shown reversible error under joinder and severance principles. *See Pena-Rodriguez*, 110 F.3d at 1128. This court has "long held that when the indictment alleges the conspiracy count as a single conspiracy, but the 'government proves multiple conspiracies and a defendant's involvement in at least one of them, then clearly there is no variance affecting that defendant's substantial rights.'" *Faulkner*, 17 F.3d at 762 (citations omitted), *cited in Pena-Rodriguez*, 110 F.3d at 1128.

In addition, the jury received a cautionary instruction warning against the transference of guilt, which further safeguarded against the possibility of prejudice. *See, e.g.*, *Pena-Rodriguez*, 110 F.3d at 1128; *Morris*, 46 F.3d at 417 (citing *Guerra-Marez*, 928 F.2d at 672); *United States v. Puig-Infante*, 19 F.3d 929, 936 (5th Cir.) (citations omitted), *cert. denied*, 513 U.S. 864, 115 S. Ct. 180 (1994). The written jury instructions in this case cautioned jurors against finding guilt if the proof

**20**

established any conspiracy other than that charged in the indictment.

In sum, we conclude that the government proved a single conspiracy, but even were we to conclude that the government adduced evidence of more than one conspiracy, the substantial rights of appellants were not affected.

### III. Sentencing

Defendants Wright and Morgan challenge their sentences on several grounds. The district court's factual determinations at sentencing are reviewed for clear error; its legal conclusions, *de novo*. *United States v. Siciliano*, 953 F.2d 939, 942 (5th Cir. 1992).

### A. Quantity of Cocaine (Morgan)

The district court assigned Morgan a base offense level of 34, the offense level under the guidelines for 50 to 150 grams of crack. U.S.S.G. § 2D1.1(c)(4). Morgan challenges the quantity range under which he was sentenced, complaining of the district court's failure to find a specific gram amount attributable to him. The district court found that "even if you exclude some of it, you're still above the 50 level." The better practice would be to make a specific finding of the quantity of cocaine attributable to a defendant. Failure to do so, however, is not reversible if a finding within the sentencing range is not clearly erroneous. *See United States v. Castillo*, 77 F.3d 1480, 1495 (5th Cir.)(holding that the district court's finding that "at least 1000 kilograms" were attributable to the defendant was "clearly adequate and

**21**

sufficiently specific" to comply with U.S.S.G. § 1B1.3), *cert. denied*, 117 S. Ct. 180 (1996); *see also* U.S.S.G. § 2D1.1 comment. (n. 12)(the sentencing judge may "approximate the quantity" of the controlled substance if no drug seizure occurred); *Basinger*, 60 F.3d at 1410; *United States v. Chatman*, 994 F.2d 1510, 1516-17 (10th Cir. 1993), *cert. denied*, 510 U.S. 883, 114 S. Ct. 230 (1993).

The district court's finding that the amount of crack attributable to Morgan was more than 50 grams was not clearly erroneous. Stuart testified that he sold Morgan 60 grams of crack cocaine in one transaction alone. We are not persuaded by Morgan's argument that the evidence associated with this amount bears insufficient indicia of reliability to support his sentence.

B.   Type of Cocaine (Morgan)

Morgan argues that the district court erred in applying the sentencing guidelines for cocaine base (crack), as opposed to another form of cocaine, because there was insufficient evidence that the drug bought and sold was crack cocaine. We have reviewed the record and the arguments of the parties and conclude that this point lacks merit.

C.   Obstruction of Justice (Morgan)

Morgan appeals the enhancement of his offense level by two points for obstruction of justice under U.S.S.G. § 3C1.1. The district court enhanced Morgan's sentence under this guideline because it found that Morgan had given perjurious testimony at trial and that the testimony was material. We review U.S.S.G. §

3C1.1 enhancement findings for clear error. *See United States v. Gray*, 105 F.3d 956, 971 (5th Cir.) (citations omitted), *cert. denied*, 117 S. Ct. 1856 (1997). Viewing the evidence in the light most favorable to Morgan,[9] the district court did not clearly err in finding that Morgan committed perjury with respect to material trial testimony. Clearly, Morgan's perjured testimony provided a sufficient basis for imposing an obstruction of justice enhancement. *See United States v. Dunnigan*, 507 U.S. 87, 113 S. Ct. 1111, 1114-17 (1993); *Gray*, 105 F.3d at 971; *United States v. Storm*, 36 F.3d 1289, 1295-97 (5th Cir. 1994), *cert. denied*, 514 U.S. 1084, 115 S. Ct. 1798 (1995); U.S.S.G. § 3C1.1 comment. (n. 3(b)).

D.  Criminal History Categories (Jackson, Morgan)

Both Morgan and Jackson argue that the district court should have departed downward because the criminal history category assigned to them overrepresents the seriousness of their criminal histories. *See* U.S.S.G. § 4A1.3.

The record reflects that the district court exercised its discretion in refusing to adjust Morgan's and Jackson's criminal history categories. The district court did not refuse to depart in violation of law or because of a mistaken application of the guidelines, nor did it do so out of a mistaken belief that it lacked the power to do so. Under these circumstances, this court lacks jurisdiction to review the district court's refusal to depart downward in calculating Morgan's and Jackson's criminal history

---

[9]    U.S.S.G. § 3C1.1.

categories.  *See United States v. Leonard*, 61 F.3d 1181, 1185 (5th Cir. 1995); *United States v. DiMarco*, 46 F.3d 476*,* 477 (5th Cir. 1995); *see also United States v. Sparks*, 2 F.3d 574, 589 (5th Cir. 1993), *cert. denied*, 510 U.S. 1080, 114 S. Ct. 899 (1994).

IV.  Evidentiary Rulings

A.  Shotgun

Wright and Jackson appeal the admission of Officer Webster's testimony that, during the course of one of the undercover drug deals where Jackson was present, a participant held a shotgun to Officer Webster's head.  Webster testified that Nathaniel Williams was holding a shotgun when Webster entered the residence and that Williams held the shotgun to Webster's head during the transaction. The district court also allowed Webster to identify a noise on the undercover tape recording of the transaction as "racking" the shotgun.  We review admissibility rulings for abuse of discretion. *United States v. Clements*, 73 F.3d 1330, 1334 (5th Cir. 1996).

In this case, the court held a hearing outside the presence of the jury, concluded that the evidence was not extraneous to the charge, and overruled Jackson's Rule 404(b) objection.  The district court acted within its discretion in determining that the use of the shotgun was not evidence extrinsic to the charge.  The shotgun was used in connection with a drug sale, which involved Jackson and other charged co-conspirators who pleaded guilty before trial.  The district court's determination that the evidence was not extrinsic comports with the Eleventh Circuit's analysis in *United States v. Weeks*:

**24**

> Evidence of criminal activity other than the charged offense is not considered extrinsic within the proscription of Rule 404(b) of the Federal Rules of Evidence if it is an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, *United States v. Kloock*, 652 F.2d 492, 494 (5th Cir. 1981), if it was inextricably intertwined with the evidence regarding the charged offense, *United States v. Killian*, 639 F.2d 206, 211 (5th Cir. 1981), *cert. denied*, 451 U.S. 1021, 101 S. Ct. 3014, 69 L.Ed. 2d 394 (1982), or if it is necessary to complete the story of the crime of the trial, *United States v. Wilson*, 578 F.2d 67, 72-73 (5th Cir. 1978).

716 F.2d 830, 832 (11th Cir. 1983); *see also United States v. Asibor*, 109 F.3d 1023, 1034 (5th Cir. 1997); *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997) (citations omitted). The use of the shotgun in this case arose out of the drug conspiracy, was inextricably intertwined with the specific drug deal, and was part of "the story of the crime." *See Weeks*, 716 F.2d at 832. Under these circumstances, the district court's determination that this evidence was not extraneous was not an abuse of discretion.

Jackson also argues that the district court erred in failing to make *Beechum* findings on the record as required by *United States v. Robinson*, 700 F.2d 205, 213 (5th Cir. 1983). We disagree for two reasons. First, because the district court properly determined that the evidence was not extraneous, no *Beechum* findings were required. *United States v. Maceo*, 947 F.2d 1191, 1199 n.3 (5th Cir. 1991), *cert. denied*, 503 U.S. 949, 112 S. Ct. 1510 (1992). Second, even if *Beechum* did apply, the district court was not required to conduct an on-the-record *Beechum* analysis because

Jackson failed to request it. *United States v. Fox*, 69 F.3d 15, 20 (5th Cir. 1995).

Finally, although the shotgun evidence is no doubt prejudicial, the trial court did not abuse its discretion in concluding that any unfair prejudice did not "substantially outweigh" its probative value as required under Rule 403.

B.   Gangs

Wright assigns as error the district court's admission of evidence "pertaining to gangs and violence." Because Wright did not object to the admission of this testimony at the time of trial, we review for plain error. *United States v. Neal*, 27 F.3d 1035, 1054 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 1165 (1995).[10]

The only references to the term "gang" in the course of the trial were contained in Agent Brown's testimony that she was assigned to the "organized crime gang squad in the Dallas Division [of the FBI]" and that she received information about the Frazier Courts area from the gang unit of the Dallas Police Department. The district court did not abuse its discretion by allowing this testimony. In any event, Wright cannot show that such reference to

---

[10]   We review for plain error even though the matter admitted was the subject of a pretrial Rule 404(b) ruling because Wright made no contemporaneous objection to the admission of the testimony at the time of trial. *See Clements*, 73 F.3d at 1337 n.7 (citing *United States v. Graves*, 5 F.3d 1546, 1551-53 (5th Cir. 1993), *cert. denied*, 511 U.S. 1081, 114 S. Ct. 1829 (1994)). At the pretrial Rule 404(b) hearing, the government introduced evidence that Wright was affiliated with the "415 Bloods." The district court ruled that the government could mention gangs generally, but that he would rule separately on any specific extrinsic criminal act related to gangs. At trial, the government made no attempt to prove any defendant's affiliation with a gang or even that gang-related activity was occurring in the area.

gangs prejudiced his substantial rights, much less that the reference "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *See Johnson v. United States*, ___ U.S. ___, 117 S.Ct. 1544, 1549 (1997) (internal quotation marks and citations omitted). Accordingly, Wright has not shown plain error.[11]

V.   Ineffective Assistance of Counsel (Wright)

Wright claims that he received ineffective assistance of counsel at trial. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). In this circuit, "a claim of ineffective assistance of counsel cannot be resolved on direct appeal when the claim has not been raised before the district court since no opportunity existed to develop the record on the merits of the allegation." *United States v. Higdon*, 832 F.2d 312, 314 (5th Cir. 1987) (citations omitted), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1051 (1988). Although Wright raised the issue of his counsel's effectiveness in a rudimentary form in the district court,[12] this

---

[11]   Wright also complains that his presentence report states that he was a leader in the 415 Bloods and that the gang had been linked to violent crimes in Dallas. Other than arguing that this "unfairly attempted to sway the reader," he does not allege that he was prejudiced by this reference. He would be hard-pressed to do so given that the district court stated at Wright's sentencing hearing that he would not consider Wright's gang-affiliation "either for or against the defendant in any shape, fashion, or form."

[12]   After trial but before sentencing, Wright filed a post-trial motion for re-appointment of counsel, in which he complained of the representation he had received from his appointed counsel. At a hearing on this motion and related matters, the district court told Wright that the court was "not really going to get into it with [him] about [his] unhappiness with [his] lawyer." Wright's appointed trial counsel continued to represent him through the

**27**

is not one of the "rare cases" in which the record is sufficiently developed on direct appeal that it would "allow[] us to evaluate fairly the merits of the claim." *Hidgon*, 832 F.2d at 314 (citation omitted).

## CONCLUSION

The convictions and sentences of Marcus Morgan and Ryan Jackson are AFFIRMED. The convictions and sentences of Jarvis Wright are AFFIRMED without prejudice to his ability to pursue an ineffective assistance of counsel claim in a habeas corpus proceeding.

---

filing of his notice of appeal.