IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 16, 2008

Charles R. Fulbruge III
Clerk

No. 07-50286

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

ALEX RAMIREZ TORRES

Defendant-Appellant

Appeal from the United States District Court
for the Western District of Texas
USDC No. 06-CR-064

Before JOLLY, BARKSDALE, and BENAVIDES, Circuit Judges.

PER CURIAM:[*]

The mandate not having issued in this case, the panel, on its own motion, has granted rehearing. We withdraw our earlier opinion filed on May 14, 2008, and substitute this opinion therefor, the only change being that we remand to the district court to allow it to fashion supervised release conditions not inconsistent with this opinion.

Appellant Alex Torres appeals his convictions and concurrent sentences for aiding and abetting possession with intent to distribute heroin and

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

conspiracy to possess with the intent to distribute heroin. We AFFIRM his convictions and MODIFY his sentence by striking the supervised release condition prohibiting him from residing with anyone who is not a blood relative or his spouse and REMAND to the district court to allow it another opportunity to fashion supervised release conditions not inconsistent with this opinion.

## I. BACKGROUND

In 2004, Appellant Alex Ramirez Torres (Torres) was an inmate at the Reeves County Detention Center, which houses federal inmates in Pecos, Texas. At this time, there was an ongoing investigation regarding the smuggling of drugs into the facility. Eli Rodriguez (Rodriguez) was also an inmate, and the investigation had focused on him and his brother, Daniel Armendarez (Armendarez), who visited Rodriguez at the facility.

On November 9, 2004, officials at the detention center intercepted a letter from Rodriguez to Armendarez, and the officials interpreted the letter as discussing a conspiracy to bring illegal drugs into the facility. The letter provided that if Armendarez would visit Rodriguez, Rodriguez would pay him $500. Thereafter, Investigator Hill began to monitor Rodriguez's phone calls and mail. On November 14, Armendarez and his wife, Victoria Zaragoza (Zaragoza), visited Rodriguez and, during that visit, Rodriguez explained that contraband, such as marijuana, was expensive in the facility. Rodriguez suggested that Zaragoza could smuggle "illegal things" into the facility by hiding them in her undergarment. He further suggested that after she was in the visiting area, she would remove the items and put them in an open bag of chips. Rodriguez would then take the contraband and hide it on his person.

On November 15, officials intercepted another letter Rodriguez had mailed. In it, Rodriguez thanked Armendarez for visiting and advised him that he would be receiving $500. Rodriguez explained that Armendarez should keep

$200 and give the remaining $300 to their uncle, Luis Gonzales (Luis).[1] Additionally, Rodriguez instructed Armendarez to put the "green" with the "other stuff" and bring it with him. Investigator Hill testified that "green" was a code word for marijuana.

On November 19, officials intercepted three of Rodriguez's phone calls. In the first call, Rodriguez asked Luis if he had the "starlight" and then told him that the money would arrive on Sunday. During the next call to Luis, Rodriguez said that he had been speaking with another "dude" and talked of possibly having Armendarez pick up the money. In the last call, Rodriguez informed Armendarez that he should obtain the money from Western Union and take it to Luis. Rodriguez informed Armendarez that Luis was "going to give you something and you bring it back." Rodriguez reiterated that: "We're still going to give you five," an apparent reference to Rodriguez's original promise to pay Armendarez.

The next day, Appellant Torres instructed his girlfriend, Priscilla Rivera (Rivera), to send $300 to Armendarez in Hobbs, New Mexico. Later that day, Rodriguez called Armendarez to confirm that he was on his way to pick up the money. Rodriguez stated "they're sending it from Glendale." Armendarez picked up the money that was wired to Western Union. Rodriguez called Luis and told him that Armendarez was picking up the money, and Luis responded that he was sending "two." Luis told Rodriguez to be very careful. Rodriguez called Armendarez and told him that Luis was waiting and said, "I'll see you tomorrow."

On November 21, Rodriguez made a phone call to an unknown recipient and learned that Armendarez was in route to the facility. The unidentified

---

[1] Because Luis Gonzales was referred to as "Luis" during the trial, we also refer to him by his first name.

speaker also informed Rodriguez that "there was only three" and, therefore, only "two and a quarter" could be sent. Rodriguez agreed.

Later that afternoon, Armendarez and his wife Zaragoza arrived at the facility. Upon their arrival, law enforcement officers questioned them regarding whether they had contraband. Armendarez denied it. Eventually, Zaragoza admitted that she had drugs on her person and agreed to "give them up." Both Armendarez and Zaragoza were arrested.

A grand jury returned an indictment charging Torres, Rodriguez, Armendarez, Zaragoza, and Rivera with aiding and abetting possession with intent to distribute marijuana (count one), aiding and abetting possession with intent to distribute heroin (count two), and conspiracy to possess with the intent to distribute marijuana and heroin (count three). 21 U.S.C. §§ 841(a)(1), 846; 18 U.S.C. § 2.

Torres was tried before a jury. At trial, a chemist testified that the substance Zaragoza carried was 1.98 grams of heroin. The government also introduced another substance obtained from Zaragoza, which the government contended was marijuana. However, no lab results were admitted proving that the substance was marijuana.

Torres's defense was that the $300 he had wired was to satisfy a gambling debt. Investigator Hill testified that there was gambling at the facility. Rodriguez testified as a defense witness and explained that inmates played numerous card games. Inmates are not allowed to possess money in prison so they would pay "in store," which indicated the prison commissary. Also, the evidence showed that inmates may only make $50 worth of purchases in a week. If an inmate's gambling debt exceeded $50, such an inmate would have their friends or family send money to the creditor inmate's family outside prison. Rodriguez also testified that an inmate would be allowed two weeks to pay or would be beaten. Rodriguez testified that Torres was a known gambler and

played cards every day. He testified the $300 was to pay a poker debt, not as part of a conspiracy. Torres had no involvement with drugs to Rodriguez's knowledge.

Rivera, Torres's girlfriend, testified that she helped Torres with his finances. Torres received quarterly checks because he is a member of the Pima Indian Tribe. Rivera would pick up a check from the reservation and deposit the money in Torres's account or he would provide her a list of people to pay. She had previously sent money to other inmates, in amounts ranging from $50 to $200. She further testified that on November 20, 2004, at the direction of Torres, she made a Western Union money transfer of $300 to Armendarez. Rivera also testified that Torres never asked her to obtain drugs or mentioned drugs.

In rebuttal, the government introduced evidence of a prior possession of drug paraphernalia by Torres. Specifically, in March 2003, Torres's cell was searched and a homemade syringe was found. The government also introduced Rodriguez's plea agreement in which he had agreed that he was involved in a drug conspiracy with Torres. Additionally, the government introduced evidence that Rodriguez had been approached by gang members who threatened him regarding testifying against Torres. The jury acquitted Torres of count one involving marijuana but convicted him on counts two and three, which charged aiding and abetting possession with intent to distribute and conspiracy with respect to the heroin recovered. After enhancing Torres's sentence based on a prior crime of violence, the district court sentenced Torres to 210 months on both counts to run concurrently. The court also imposed several conditions with respect to his term of supervised release. Torres now appeals his convictions and sentences.

II.   CHALLENGES TO HIS CONVICTIONS

    A.   Sufficiency of the Evidence

Torres argues that the evidence is insufficient to sustain his convictions. Torres moved for a Rule 29 motion for judgment of acquittal at the close of evidence and renewed it prior to jury instructions. We review the denial of a motion for a judgment of acquittal de novo. *United States v. Medina*, 161 F.3d 867, 872 (5th Cir. 1998).

When reviewing the sufficiency of the evidence, we view all evidence, whether circumstantial or direct, in the light most favorable to the government with all reasonable inferences and credibility choices to be made in support of the jury's verdict. *United States v. Salazar*, 958 F.2d 1285, 1290-91 (5th Cir. 1992). The evidence is sufficient to support a conviction if a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* The evidence need not exclude every reasonable hypothesis of innocence or be completely inconsistent with every conclusion except guilt, so long as a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. *United States v. Faulkner*, 17 F.3d 745, 768 (5th Cir. 1994).

To demonstrate the existence of a drug conspiracy in violation of 21 U.S.C. § 846, the government must prove: 1) an agreement existed to violate drug laws; 2) the appellants knew of the agreement; and 3) the appellants voluntarily participated in it. *United States v. Morgan*, 117 F.3d 849, 853 (5th Cir. 1997) (citation omitted). To uphold a conviction for aiding and abetting under 18 U.S.C. § 2, the government must prove that the defendant associated with a criminal venture, purposefully participated in the criminal activity, and sought by his actions to make the venture successful. *United States v. Polk*, 56 F.3d 613, 620 (5th Cir. 1995) (citations omitted). A defendant associates with the criminal venture if he shares in the criminal intent of the principal. *United States v. Jaramillo*, 42 F.3d 920, 923 (5th Cir. 1995). A defendant participates in the criminal activity if he has "acted in some affirmative manner designed to aid the venture." *Id.*

Torres contends that the entirety of the government's evidence against him consisted of a money transfer payable to Armendarez and a homemade syringe found in his shared cell more than a year before the instant offense. It is undisputed that Armendarez and Rodriguez were involved in a drug trafficking conspiracy. It is undisputed that pursuant to Torres's instructions, his girlfriend sent $300 to Armendarez. The crux of the matter is whether Torres intended the money to be used to purchase drugs or to pay off his gambling debt.

The government responds that the jury could infer from the timing of the money transfer, the specific $300 amount, and the named payee (Armendarez) that Torres was an active and knowing participant in the conspiracy and aided and abetted in the possession with intent to distribute. The government also points to the recorded phone conversations in which Rodriguez mentions talking with "that other dude" and twice speaks in the plural when talking about sending the money.

As previously stated, the only contested issue is whether Torres intended the $300 to be used to purchase drugs or to pay off his gambling debt. Torres's former girlfriend testified that the amount of money she had previously sent to other inmates ranged from $50 to $200 and that $50 was the amount most often sent. Her testimony indicates that the wire transfer at issue was exceptional in that it was the highest amount ($300) Torres had her transfer to other inmates.

With respect to defense witness Rodriguez's testimony that the $300 was to pay a gambling debt, the jury was free to reject it. Further, the jury could consider the homemade syringe previously found in Torres's cell in determining whether he had the intent to purchase the drugs. Finally, the government solicited testimony that Torres "shoots up" heroin. In sum, viewing the evidence in the light most favorable to the verdict, we find it sufficient to prove Torres intended the $300 be used by Armendarez to purchase drugs.

B.      Admission of Evidence

Torres next contends that the district court erred in allowing the admission of evidence showing that a homemade syringe was found in his shared cell in an Arizona prison on March 23, 2003.  The district court found that the 2003 seizure was not too remote in time from the instant offenses committed in November 2004.  The court also found that the probative value of the evidence outweighed any prejudicial effect.

> Rule 404(b) of the Federal Rules of Evidence provides that:
>
> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

The district court's admission of extrinsic acts evidence may be reversed only upon a clear showing of an abuse of discretion.  United States v. McCarty, 36 F.3d 1349, 1353 (5th Cir. 1994).  In assessing violations of Rule 404(b), we engage in a two-part test: (1) whether the evidence is relevant to an issue other than the defendant's character; and (2) whether the evidence possesses probative value that is not substantially outweighed by the danger of unfair prejudice and is otherwise admissible under Rule 403.  United States v. Beechum, 582 F.2d 898, 911 (5th Cir. 1978).

Beechum teaches that for extrinsic conduct to be relevant, the government must first demonstrate the defendant committed the act.  582 F.2d at 912-13.  "The standard for the admissibility of extrinsic offense evidence is that of rule 104(b): 'the preliminary fact can be decided by the judge against the proponent only where the jury could not reasonably find the preliminary fact to exist.'"  Id. at 913 (quoting 21 C. Wright & K. Graham, Federal Practice and Procedure: Evidence § 5054, at 269 (1977)).  Here, the evidence established that the syringe

was found on Torres's shelf in his cell. Thus, a jury could reasonably find that Torres possessed it.

Torres does not dispute that the extrinsic evidence is relevant to an issue other than his character. We agree. United States v. Parziale, 947 F.2d 123, 129 (5th Cir. 1991) (explaining that mere entry of a not guilty plea in a conspiracy case raises the issue of intent to justify admission of extrinsic evidence). The first prong of Beechum is thus satisfied. Next, it must be determined whether the requirements of Rule 403 are satisfied.

Torres also does not dispute that the syringe was probative of his intent with respect to the charged offense. Instead, he simply asserts that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. He contends that there was no evidence he used heroin, such as a positive drug test or needle marks on his arms. He argues that in light of the lack of evidence of his guilt, the syringe in all probability led to his wrongful conviction. Torres incorrectly contends that there was no other evidence that he injected drugs. During Sergeant Ramos's testimony, he briefly mentioned that Rodriguez admitted to him that Torres "shoots up" heroin. In any event, the premise of Torres's argument is faulty. Beechum provides that "if the Government has a strong case on the intent issue, the extrinsic offense may add little and consequently will be excluded more readily." 582 F.2d at 914. Therefore, because the evidence of Torres's intent was not particularly strong, the syringe had significant probative value.

Finally, any danger of unfair prejudice was diminished by the limiting instruction to the jury.[2] See United States v. Saucedo-Munoz, 307 F.3d 344, 350

---

[2] The district court instructed the jury as follows:

You must not consider this evidence in deciding if Mr. Torres committed the acts charged in the indictment; however you may consider this evidence for other, very limited, purposes. If you find beyond a reasonable doubt from other

(5th Cir. 2002) (explaining that any prejudicial effect may be minimized with a proper limiting instruction). Under these circumstances, the probative value of the syringe was not outweighed by any unfair prejudice, and we thus affirm the district court's evidentiary ruling.

C.     Jury Instruction

Torres next contends that the trial court erred in refusing to give the jury his proposed instruction on personal use. More specifically, Torres's proposed instruction provided that a jury could infer intent to distribute from the quantity of drugs:

> The intent to distribute controlled substances may be inferred solely from the possession amount of a controlled substance if too large to be used by the possessor alone, but a quantity that is consistent with personal use does not raise such an inference in absence of other evidence.

This Court reviews the district court's refusal to give a requested jury instruction for an abuse of discretion. United States v. Pennington, 20 F.3d 593, 600 (5th Cir. 1994). "The refusal to give a jury instruction constitutes error only if the instruction (1) was substantially correct, (2) was not substantially covered in the charge delivered to the jury, and (3) concerned an important issue so that the failure to give it seriously impaired the defendant's ability to present a given defense." Id. (citation omitted).

In the instant case, during the charge conference, the district court ruled that Torres was not entitled to a personal use instruction because he never possessed the drugs and the evidence shows the drugs had been distributed or transferred among the parties. In other words, the district court ruled that the

---

evidence in this case that the Defendant did commit the acts charged in the indictment, then you may consider this evidence of the syringe found in his cell in Arizona in 2003 to determine whether or not the Defendant had the state of mind, intent, knowledge, or motive to commit the acts for which he is charged in the indictment.

undisputed evidence was that the drugs had been distributed or transferred (Armendarez to Zaragoza), and thus the evidence did not support the personal use instruction. We need not determine whether the district court's reasoning is correct because the district court's instructions substantially covered the proposed charge. In United States v. Galvan, the appellant argued that the district court erred in refusing to give an instruction that the quantity of drugs involved could be consistent with personal use and did not give rise to an inference of intent to distribute. 133 F. App'x 154, 156 (5th Cir. 2005). This Court rejected the argument "because the substance of the requested jury instruction was in fact included in the court's charge, which instructed the jury that it could find the defendant guilty of the lesser included offense of mere possession." Id. Likewise, in the instant case, the charge instructed the jury that it could convict Torres of the lesser included offenses of aiding and abetting the possession of heroin and conspiracy to possess heroin. Accordingly, the district court did not abuse its discretion in refusing the jury instruction.

III. SENTENCING CHALLENGES

A. Crime of Violence Sentencing Enhancement

Torres contends that the district court erred in finding that one of his prior convictions was a crime of violence and enhancing his sentence 16 levels on that basis. Torres does not dispute that he previously pleaded guilty to burglary of a habitation in Arizona state court.

Pursuant to U.S.S.G. § 4B1.2(a)(1) and (2), a "crime of violence" "has as an element the use, attempted use, or threatened use of physical force against the person of another, or (2) is burglary of a dwelling . . . ." (emphasis added). Torres pleaded guilty to violating the following statute: "A person commits burglary in the second degree by entering or remaining unlawfully in or on a residential structure with the intent to commit any theft or any felony therein." Ariz. Rev. Stat. Ann. § 13-1507.

11

This Court employs two different methodologies to determine whether a prior offense constitutes a crime of violence: "(1) because it is an enumerated offense or (2) because it has as an element the use or attempted use of force." United States v. Mungia-Portillo, 484 F.3d 813, 816 (5th Cir.) (citation omitted), cert. denied, __ U.S. __, 128 S.Ct. 320 (2007). Section 4B1.2(a)(2) expressly lists "burglary of a dwelling" as a crime of violence, and thus it is an enumerated offense. Torres concedes that he pleaded guilty to burglary of a habitation. In United States v. Hornsby, 88 F.3d 336 (5th Cir.1996), this Court held that burglary of a habitation is a "crime of violence" under § 4B1.2 because "burglary of a dwelling" was listed as an enumerated offense. Id. at 339.

Torres nonetheless argues that it was not a crime of violence because the state court judgment provides a notation that the crime was a "non-violent and non-repetitive offense." Apparently, the state sentencing judge made that finding. The instant guidelines question, however, is one of federal law, which controls. See United States v. Serna, 309 F.3d 859, 863 (5th Cir. 2002) (explaining that federal law controls the determination of whether a prior conviction was a "crime of violence" under § 4B1.2). Thus, the individual state judge's characterization of Torres's offense is of no moment. Under our precedent, the district court properly found that Torres's prior conviction was an enumerated offense and the 16-level enhancement is affirmed.

B.    Conditions of Supervised Release

Torres challenges two conditions on his term of supervised release. Title 18 U.S.C. § 3583 governs the imposition, modification, or revocation of a term of supervised release. Section 3583 provides that when sentencing a defendant to a term of incarceration, a court may include a term of supervised release to follow imprisonment. The court may impose conditions on the defendant's term of supervised release. In addition to certain mandatory conditions, section 3583(d) provides that a court may impose "any condition set forth as a

discretionary condition of probation in section 3563(b)(1) through (b)(10) and (b)(12) through (b)(20), and any other condition it considers to be appropriate."

Although a district court has broad discretion in imposing conditions on supervised release, such conditions must be reasonably related to the factors set forth in § 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D). United States v. Ferguson, 369 F.3d 847, 852 (5th Cir. 2004). The statutory factors include: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant," (2) the need "to afford adequate deterrence to criminal conduct," (3) the need "to protect the public from further crimes of the defendant," and (4) the need "to provide the defendant with needed [training], medical care, or other correctional treatment in the most effective manner." Id. (citations omitted) (brackets in opinion).

Even if the condition is reasonably related to the above factors, the court may not impose conditions that "involve a greater deprivation of liberty than is reasonably necessary to achieve the latter three statutory goals." Id. (citation omitted). Additionally, the conditions must be "consistent with any pertinent policy statements issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a)." Id. (quoting section 3583(d)).

### 1.    Condition on Who May Reside with Torres

The district court imposed the following condition on Torres's supervised release: "The defendant shall not reside with anyone who is not a blood relative, or that the defendant is not legally married to whether it be a civil or religious ceremony during the term of supervision." Torres admits that he failed to object and therefore the claim is reviewed for plain error. Before an appellate court can correct an error not raised below, there must be: (1) error; (2) that is plain; and (3) that affects substantial rights. United States v. Olano, 507 U.S. 725, 732-34 (1993). If all three prerequisites are met, the Court may exercise its discretion

to correct a forfeited error, but only if the error seriously affects the fairness, integrity, or public reputation of the judicial proceedings. Id. at 735-37.

The government concedes that the court's sua sponte requirement that Torres live with a spouse or blood relative is plain error. We agree. In United States v. Smith, the district court ordered that "during his period of supervised release, defendant shall not cause [the] conception of another child other than to his wife, unless he can demonstrate he is fully providing support to the three children presently in existence, and the two en ventre sa mere." 972 F.2d 960, 961 (8th Cir. 1992) (brackets in opinion). The Eighth Circuit opined that the "number of children that Smith has fathered is in no way related to 'the nature and circumstances of' Smith's drug offense." Id. at 962. Further, the Court explained that "[t]here is no reason to believe that restricting Smith from fathering more children will deter Smith from future criminal conduct, protect the public, or assist in Smith's rehabilitation." Id. Thus, the Court reversed the condition.

In the instant case, the special condition would prohibit Torres from residing with an individual who is not his spouse or related by blood. Indeed, if read literally, it would prohibit Torres from living with a step-brother. We find the instant restriction is overbroad and not reasonably related to Torres's offense, the need to protect the public, or Torres's rehabilitation. We find reversible plain error and strike this condition from the judgment.

2.      Order to Establish Child Support Accounts

Torres also asserts that the district court plainly erred in ordering him to "establish an account in Arizona for the support of his/her minor child/children" as a condition of his supervised release. The sentencing guidelines provide that:

> [T]he defendant shall support the defendant's dependents and meet other family responsibilities (including, but not limited to, complying with the terms of any court order or administrative process pursuant to the law of a state, the District of Columbia, or

any other possession or territory of the United States requiring payments by the defendant for the support and maintenance of any child or of a child and the parent with whom the child is living).

U.S.S.G. § 5D1.3(c)(4). Further, pursuant to statute, Congress has expressly authorized a district court to require a defendant, as a condition of supervised release, to "support his dependents and meet other family responsibilities." 18 U.S.C. § 3563(b)(1).

Torres concedes that our review is for plain error. The government responds that § 5D1.3(c)(4) has been interpreted to mean that a district court can enforce a state court order for child support as a condition of supervised release. United States v. Lakatos, 241 F.3d 690, 693 (9th Cir. 2001). Here, however, there is no contention that there is an existing state court child support order. Nonetheless, the above-quoted guideline provides that the defendant's obligation to support his dependents is "including, but not limited to, complying with the terms of any court order . . . ." § 5D1.3(c)(4) (emphasis added). This language indicates that a district court may impose conditions in addition to a state court child support order. In light of the statutory and sentencing guideline authorization to order a defendant to support his dependents, Torres has not carried his burden of showing plain error.

IV. CONCLUSION

For the above reasons, we AFFIRM Torres's convictions and MODIFY his sentence by striking the following supervised release condition: "The defendant shall not reside with anyone who is not a blood relative, or that the defendant is not legally married to whether it be a civil or religious ceremony during the term of supervision." We REMAND the case to the district court to allow it another opportunity to fashion supervised release conditions not inconsistent with this opinion.

AFFIRMED as MODIFIED; REMANDED.