UNITED STATES of America, Appellee,

v.

**Randolph LANCASTER, Appellant.**

**No. 91–3045.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 13, 1992.

Decided June 30, 1992.

Robert L. Tucker, Asst. Federal Public Defender, with whom A.J. Kramer, Federal Public Defender, was on the brief, for appellant.

Robert A. De La Cruz, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty. and John R. Fisher and Thomas J. Tourish, Jr., Asst. U.S. Attys., were on the brief, for appellee.

Before D.H. GINSBURG, HENDERSON and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

Appellant Randolph Lancaster Sr. was convicted by a jury on one count of aiding and abetting the distribution of cocaine base (crack) and five counts of maintaining a "crack house," for which he was sentenced to 51 months' imprisonment and three years' supervised release. Lancaster appeals both the crack house convictions

and his sentence. For the reasons set out below, we affirm Lancaster's convictions but remand for new sentencing because, in calculating Lancaster's combined offense level, the district court erroneously aggregated drug quantities under section 1B1.3(a)(2) of the United States Sentencing Guidelines (Guidelines).

In deciding this appeal, we must view the evidence in the light most favorable to the government, allowing it the benefit of all reasonable inferences that may be drawn from the evidence and permitting the jury to determine the weight and credibility of the evidence. *United States v. Butler*, 924 F.2d 1124, 1126 (D.C.Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 205, 116 L.Ed.2d 164 (1991). So viewed, the evidence reveals the following material facts.

Up until 1988 Lancaster was the owner of a house on Marion Street, N.W., in the District of Columbia. Between June and December of that year the house was repeatedly searched by agents from various law enforcement agencies who on each occasion discovered large groups of individuals on the premises along with quantities of drugs and drug paraphernalia. As a result, the house was ultimately seized by the government. A summary of the circumstances leading up to and surrounding that seizure follows.

On June 15, 1988, an undercover investigator for the Metropolitan Police Department, acting as part of an arrest team, approached Lancaster's house to make a "back-up" purchase of narcotics before executing a search warrant for the house. The investigator was greeted at the door by Lancaster who led him upstairs and introduced him to a woman there. After Lancaster assured the woman the investigator was "okay," she sold him a small chunk of crack for $40. The investigator then left with the crack and rejoined his team. When the substance field-tested positive for cocaine, the team proceeded to execute the warrant and search the house. They discovered twenty-two people inside and seized an undisclosed quantity of cocaine, 190 milligrams of marijuana, glass smoking pipes and $176 in cash.

On September 1, 1988, around 7:30 or 8:00 p.m., Lancaster's house was again searched pursuant to a warrant, this time by agents of the Bureau of Alcohol, Tobacco and Firearms and the United States Park Police. Inside the house, the agents found 20 individuals, including Lancaster, and seized 1.159 grams of crack, 2.745 grams of cocaine powder, a mirror containing cocaine residue, razor blades and glass smoking pipes. A woman present at the time later testified that she saw crack being sold in the house that day, that a number of people regularly sold drugs there, and that "[s]omebody could come to there and ask for coke any time of the night." Transcript of Jury Trial (Trial Tr.) I–97.

Lancaster's house was again searched the evening of September 16, 1988. This time, agents from the Drug Enforcement Agency found nineteen or twenty people on the premises along with 171 milligrams of crack, fifteen or sixteen smoking pipes, a burning butane lighting device and $245 in cash.

Because of the repeated drug activity, a seizure warrant was issued for the house and on October 11, 1988, officers of the Metropolitan Police Department and the United States Marshals Service visited the house to execute the warrant. On entering, they discovered about twenty people inside, including Lancaster, and recovered 1.664 grams of crack. They then served the seizure warrant on Lancaster and directed him to gather his belongings and vacate the house. In addition, a carpenter was summoned to change the locks and board the house and signs were posted at the front and rear identifying the house as seized property and prohibiting entry.

On December 1, 1988, officers from the Metropolitan Police Department and the United States Marshals Service again visited the house, responding to reports of continued drug use there. When they arrived, they saw Lancaster leaving through a basement entrance from which the boarding had been removed. Inside, the officers discovered nine or ten people and four glass pipes containing cocaine residue.

Lancaster was subsequently indicted on one count of aiding and abetting the distribution of crack in violation of 21 U.S.C. § 841(a) and 18 U.S.C. § 2, based on the back-up purchase of cocaine on June 15, 1988, (count 2) and five counts of maintaining his house for the consumption or distribution of drugs in violation of 21 U.S.C. § 856, based on the five searches of his house (counts 1, 3–6). On July 14, 1989, a jury convicted Lancaster on all six counts. On February 6, 1991, the district court sentenced Lancaster to sentences of twenty-seven months on counts 1, 3, 4, 5 and 6 and fifty-one months [1] on count 2, to run concurrently with each other and to be followed by concurrent three-year terms of supervised release. On appeal, Lancaster challenges both his crack house convictions and his sentence on the distribution charge. We address the two challenges separately.

## I. The Convictions

First, Lancaster appeals his convictions on counts 1, 3, 4, 5 and 6, asserting four grounds for reversal: (1) 21 U.S.C. § 856 is unconstitutionally vague; (2) the trial court incorrectly instructed the jury on the elements of a section 856 violation; (3) the court improperly admitted testimony concerning crack houses; and (4) the evidence was insufficient to support the conviction on count 6. We find none of these grounds persuasive.

■ Lancaster first asserts that 21 U.S.C. § 856, the crack house statute, is void for vagueness. Subsection (a) of that statute provides:

(a) Except as authorized by this title, it shall be unlawful to—

(1) knowingly open or maintain any place for the purpose of manufacturing, distributing, or using any controlled substance; [or]

(2) manage or control any building, room, or enclosure, either as an owner, lessee, agent, employee, or mortgagee, and knowingly and intentionally rent, lease, or make available for use, with or without compensation, the building, room, or enclosure for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance.

21 U.S.C. § 856.[2] Lancaster contends subsection (a)(1) of the statute is unconstitutionally vague because it does not give fair notice of the conduct it prohibits. *See Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972) (criminal statute is void for vagueness if "it 'fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute'") (quoting *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed. 989 (1954)). Specifically, Lancaster argues that the statutory language is ambiguous because it can be construed to prohibit simple possession and personal consumption of drugs in one's residence, although it does not give fair notice that it does, and that it may have been so interpreted by the jury that convicted him. We find no such ambiguity in the statutory language.

Section 856(a)(1) makes it unlawful only to "open or maintain any place *for the purpose of* manufacturing, distributing, or using any controlled substance." The "casual" drug user does not run afoul of this prohibition because he does not maintain his house for the purpose of using drugs but rather for the purpose of residence, the consumption of drugs therein being merely incidental to that purpose. Thus, subsection (a)(1) cannot reasonably be construed, as Lancaster contends, to criminalize simple consumption of drugs in one's home. Even were such a construction possible, however, it would not avail Lancaster whose conduct went far beyond personal consumption. The statute certainly furnishes fair notice that opening one's house to the kind of wholesale drug use

---

1. This was the sentence imposed orally at the sentencing hearing and it reflects the minimum prison term under the guideline range adopted by the court. For some reason, however, the judgment of conviction sets out a sentence of fifty months' imprisonment for count two.

2. Subsection (b) of the statute sets out the maximum penalties for violation of subsection (a).

proven at trial is proscribed. Thus, the statute is not vague as applied to Lancaster's conduct so as to warrant reversal of his convictions. *See United States v. National Dairy Prods. Corp.*, 372 U.S. 29, 33, 83 S.Ct. 594, 598, 9 L.Ed.2d 561 (1963) (court must consider vagueness attack solely in relation to whether statute sufficiently warns defendant that his particular conduct is prohibited thereunder); *see also United States v. Thomas*, 864 F.2d 188, 196–97 (D.C.Cir.1988) (rejecting vagueness challenge to regulation that was not vague as applied to defendants-appellants).

■ Next, Lancaster asserts the court improperly instructed the jury regarding the requirements of section 856(a), commingling the elements of subsections 856(a)(1) and 856(a)(2). We perceive no reversible error in the challenged instruction.

Because Lancaster failed to object to the instruction at trial we may reverse only if it constitutes plain error affecting a substantial right so that a miscarriage of justice would otherwise result. *United States v. Zabalaga*, 834 F.2d 1062, 1066 (D.C.Cir. 1987). That is not the case here. The jury charge contained the following instruction regarding the crack house statute:

> First, the government must prove in each of these counts … that the defendant managed, controlled, opened, or maintained any building, room, or enclosure, and that he did so for the purpose of manufacturing, storing, distributing, or using a controlled substance; further, that he did so knowingly, and at the time he did so, the defendant was either the owner, lessee, agent, employee, or mortgagee of the premises.

Trial Tr. IIIA–19. This language adequately sets out the elements of a subsection 856(a)(1) violation, namely, that the defendant open or maintain a place with the purpose that drugs be manufactured, distributed or used there. The instruction's defect, if any, is that it also adds the requirement, drawn from subsection 856(a)(2), that "the defendant was either the owner, lessee, agent, employee, or mortgagee of the premises." Thus, if there was error in the instruction, it worked to Lancaster's advantage, not prejudice, because it imposed on the government the burden of proving an additional, unnecessary element in order to establish a subsection (a)(1) violation. Accordingly, the instruction presents no cause for reversal.

■ Third, Lancaster argues the trial court improperly admitted certain testimony regarding crack houses. At trial, Metropolitan Police Sergeant John Hickey, while testifying concerning the October 11 raid, referred several times to Lancaster's house as a "crack house." Trial Tr. II–18. In addition, the Government's expert witness, Metropolitan Police Officer David Stroud, testified at some length regarding how crack is distributed and consumed and, briefly, about how a crack house operates. During the latter testimony, Stroud noted that in a typical crack house, "there will be acts of prostitution." [3] Lancaster asserts that Hickey's references to crack houses and Stroud's testimony regarding activities

---

**3.** The full text of Stroud's crack house testimony reads as follows:

> I'll start by what is a crack house first. A crack house can be a house or an apartment that's main purpose is used to ingest crack. In these houses, the people who are crack users will come in just for the purpose of ingesting it.
>
> Now in those houses, you can also have some small, some small sales may also be made, too, and they will also be nice enough to rent you a pipe if you haven't got your own. And from my experience from going into these crack houses, most of the activity will take place in a large room, like a living room or a basement. That way, you have a whole bunch of people can congregate, maybe 20 or 30 people at a time can all congregate and sit around and smoke the crack.
>
> In the kitchen, somebody in the kitchen might also be making some more crack, and also, if you go to one of the other rooms, there will be acts of prostitution also going on in there.
>
> Also most of these houses are very dirty and unkempt, and if you have a crack house in your neighborhood, they aren't very hard to spot at all, because you would just watch for a while, you'd notice activity going on by and around the house 24 hours a day, people going in and out 24 hours a day, characters you've never seen on your block before are coming in there.

Trial Tr. II–158 to –59.

that occur there, particularly prostitution, require reversal of his crack house convictions. We disagree for the following reasons.

First, it cannot have been error to refer to Lancaster's house as a crack house when that is precisely what the indictment alleged, the testimony suggested and the jury apparently found that it was. As for Stroud's testimony, the district court has broad discretion in admitting expert testimony, *United States v. Dunn*, 846 F.2d 761, 763 (D.C.Cir.1988), and we do not believe the court abused that discretion here. Stroud's explanation of how crack is distributed and consumed was admissible as expert testimony because it was calculated to "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702; *cf. United States v. Dunn*, 846 F.2d at 763 ("Federal courts often permit experts to testify on narcotics operations because jurors are commonly unfamiliar with the methods by which drug dealers attempt to conceal their activities."). The same is true of his crack house testimony since the case against Lancaster turned entirely on whether his house was one. As for the single reference to prostitution, given the weight of the evidence against Lancaster, we do not see how that isolated remark "could have independently affected the jury's verdict" so as to warrant reversal. *See United States v. Anderson*, 851 F.2d 384, 393-94 (D.C.Cir. 1988), *cert. denied*, 488 U.S. 1012, 109 S.Ct. 801, 102 L.Ed.2d 792 (1989).

■ Finally, Lancaster asserts the evidence was insufficient to support his conviction on count 6 because there was no evidence that on December 1, 1988, when the activity alleged in that count occurred, he retained control of the Marion Street house which had by then been seized and boarded by the government. We reject this argument as well.

After the house was seized Lancaster retained legal title to it and neighbors observed him in the vicinity and actually coming out of the house. Trial Tr. II–87 to II–88, II–111, II–122 to II–123. Further, when the officers arrived on December 1, 1988, they saw Lancaster emerging from an unboarded basement entrance and discovered nine or ten other people on the premises in possession of and apparently consuming narcotics. This evidence, while not overwhelming, is nevertheless sufficient to support the inference that Lancaster retained control over the premises and made it available to others in violation of section 856.

For the preceding reasons, we affirm Lancaster's convictions on all six counts.

## II.  The Sentence

■ We next address Lancaster's appeal of his sentence on the distribution count. The district court, adopting the recommendations in the Presentence Report, imposed a sentence of fifty-one months as follows:

(1) First, the Court grouped together the five crack house counts (1, 3–6), but not the distribution count, under section 3D1.2 of the Guidelines which provides:

**Groups of Closely–Related Counts**

All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:

(a) When counts involve the same victim and the same act or transaction.

(b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.

(c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.

(d) When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

U.S.S.G. § 3D1.2.[4]

(2) Next, the court assigned a base offense level of 16 to the five-count grouping pursuant to Guidelines sections 2D1.8 (setting a base offense level of 16 for the offense of "Renting or Managing a Drug Establishment") and 3D1.3(a) (for counts grouped under section 3D1.2(a)–(c), the group offense level is the offense level "for the most serious of the counts comprising the Group, *i.e.*, the highest offense level of the counts in the Group").

(3) Third, the court assigned to the distribution count a base offense level of 20 under Guidelines section 2D1.1(a)(3) table 12 based on the total quantity of drugs involved in all six counts, which was the equivalent of 56.01 grams of heroin. The Court included the drug quantities from the five crack house counts under the theory that the offenses alleged in those counts constituted conduct relevant to the distribution offense under Guidelines section 1B1.3(a)(2) which provides:

**Relevant Conduct (Factors that Determine the Guideline Range)**

(a) Chapters Two (Offense Conduct) and Three (Adjustments). Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level ...

shall be determined on the basis of the following:

. . . . .

(2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction;

. . . .

U.S.S.G. § 1B1.3(a)(2).

(4) Fourth, the court calculated a combined offense level of 22 for the distribution count and the crack house group pursuant to Guidelines section 3D1.4(a) which provides that when two "groups" are within four levels of each other the combined offense level is determined by increasing the level of the higher group by two points.[5]

(5) Finally, the court calculated a guideline sentencing range of 51–63 months, based on an offense level of 22 and a criminal history category of III, and, rejecting Lancaster's plea for a downward departure, imposed the minimum sentence within that range.

Lancaster challenges the court's sentencing methodology on the ground that it should not have considered the crack house counts as relevant conduct under section 1B1.3(a)(2) because those counts were not required to be grouped under section 3D1.2(d).[6] Thus, Lancaster maintains, the

---

**4.** It is unclear under which subsection the court grouped the five counts. The Presentence Report recommended grouping under section 3D1.2(d), but, as discussed below, the crack house counts do not qualify for grouping thereunder. The counts should be grouped under subsection (b) and the grouping discussion during the sentencing hearing suggests that the court may have had that subsection in mind. *See* Sent. Tr. 3 ("I have reviewed the grouping of closely-related counts under 3D1.2, where the counts involving substantially the same harm should be grouped together in a single group, and—talking about the same victim being the society at large, et cetera.").

**5.** Section 3D1.4(a) provides:
**Determining the Combined Offense Level**
The combined offense level is determined by taking the offense level applicable to the Group with the highest offense level and increasing that offense level by the amount indicated in the following table:

| Number of Units | Increase in Offense Level |
| --- | --- |
| 1 | none |
| 1½ | add 1 level |
| 2 | add 2 levels |
| 2½–3 | add 3 levels |
| 3½–5 | add 4 levels |
| More than 5 | add 5 levels |

In determining the number of Units for purposes of this section:
(a) Count as one Unit the Group with the highest offense level. Count one additional Unit for each Group that is equally serious or from 1 to 4 levels less serious.
U.S.S.G. § 3D1.4(a)

**6.** Alternatively, Lancaster asserts that if the drugs were properly aggregated under section 1B1.3(a)(2), all six counts should have been grouped together under section 3D1.2(d). As we explain below, however, the crack house counts cannot be grouped together under section 3D1.2(d). *See infra* text accompanying

offense level for the distribution count should have been calculated solely on the basis of the quantity of cocaine actually purchased in the back-up buy without consideration of the drugs recovered from the five searches of the house. We agree with Lancaster that the court improperly aggregated the drugs under section 1B1.3(a)(2) and therefore conclude the case must be remanded for a new sentencing.

Section 1B1.3(a)(2) authorizes the sentencing court to take into account "solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). In other words, this subsection permits a court to consider as relevant conduct related "acts and omissions" but only those chargeable as offenses required to be grouped under section 3D1.2(d). *See* U.S.S.G. § 1B1.3 application note 2 ¶ 2 (in sentencing on cocaine distribution conviction, section 1B1.3(a)(2) permits consideration of quantity of cocaine involved in uncharged attempted distribution because "[t]he two *offenses* (sale of cocaine and attempted sale of cocaine), although cover-

ed by different statutory provisions, are of a character for which § 3D1.2(d) would require the grouping of counts, had the defendant been convicted of both counts") (emphasis added). Thus, for example, if the district court found that in the course of operating a crack house Lancaster also engaged in conduct that amounted to distribution of the drugs seized, aggregation would be proper under section 1B1.3(a)(2), even though Lancaster was not indicted for or convicted of distributing those drugs, because the offense level for distribution "is determined largely on the basis of ... the quantity of a substance involved" so as to require grouping of distribution counts under section 3D1.2(d).[7] The court, however, made no such finding.[8] To all appearances it considered only that conduct for which Lancaster was indicted and convicted, namely, five instances of maintaining a house for drug activity and a single instance of aiding and abetting distribution of a small amount of crack. Violation of the crack house statute cannot by itself be considered as relevant conduct in calculating the offense level for a distribution conviction because the former is not "of a character for which § 3D1.2(d) would require grouping of multiple counts."[9] A crack house offense satisfies neither of the

---

notes 9 & 10. For the same reasons, none of the crack houses can be grouped with the distribution count.

7. The court would also have to find that the other acts of distribution were "part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). In fact, the court seems to have found to the contrary when it decided not to group the distribution count with the crack house counts. At that time, the court stated:

I agree with the probation office that the distribution charge does not involve the same behavior really as the maintaining a crack house and that they were separate instances of maintaining a crack house, separate and apart and different occasions from the distribution charge, and as such, they would not be appropriately related cases for grouping. It's a different type of action, I believe.

So therefore, the, it is not duplicative or action already accounted for in the maintaining a crack house, and I'm going to not group Count 2 with the remaining counts....

Transcript of February 6, 1991, Sentencing Hearing (Sent. Tr.) 3–4. In any event, aggregation under section 1B1.3(a)(2) is inconsistent

with a failure to group all six counts under section 3D1.2(b) which requires grouping of all counts that "involve the same victim and two or more acts or transactions connected by a common criminal objective or *constituting part of a common scheme or plan.*" U.S.S.G. § 3D1.2(b) (emphasis added).

8. Nor does it appear that the Government ever sought or cited evidence that would support such a finding.

9. In fact, section 1B1.3(a)(2) appears to have been designed to permit consideration only of offense conduct of which a defendant has *not* been convicted, as the use of the periphrastic subjunctive "would require" suggests, *see United States v. White,* 888 F.2d 490, 497 (7th Cir.1989) ("The subjunctive ('would') indicates a contrary-to-fact condition."). When a defendant *is* found guilty of offenses which should be grouped under section 3D1.2(d), drug quantities are aggregated under section 3D1.3(b) which provides:

"In the case of counts grouped together pursuant to § 3D1.2(d), the offense level applicable to a Group is the offense level corresponding to the aggregated quantity." *See* U.S.S.G. § 1B1.3

alternative criteria for section 3D1.2(d) grouping, namely that "the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm" or "the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior." *See* U.S.S.G. § 2D1.8 (setting a single base offense level of 16 for a crack house offense, regardless of the amount of drugs involved).[10]

For the preceding reasons, we conclude the district court erred in calculating the base offense level for the distribution count based on the aggregated drug quantities and, consequently, in calculating a combined offense level of 22 and imposing a sentence based thereon. Accordingly, the court's sentence must be vacated and a new one imposed.

Finally, Lancaster argues the district court erred in ruling it was without authority to depart downward to compensate for the lengthy delay in his sentencing which, he alleges, increased the total time he must spend in prison. In urging the district court to depart, Lancaster argued that, if he had been sentenced promptly in 1989, his federal sentence would have run in part concurrently with a District of Columbia prison term which ended in 1990, decreasing the total time he spent in prison under the two sentences. The Court decided against departure but the record does not clearly reflect whether the court determined it was without authority to depart, which is a reviewable ruling, *see United States v. Lopez*, 938 F.2d 1293, 1296

(D.C.Cir.1991), or whether it merely concluded that the particular circumstances here did not warrant such a departure, a decision that is not reviewable, *see United States v. Salmon*, 948 F.2d 776, 780 (D.C.Cir.1991).[11] Because the district court will have the opportunity to clarify its ruling during the new sentencing necessitated by the erroneous drug aggregation, we decline to decide at this time whether the court had authority to depart as requested, a significant question of first impression in this circuit.

For the reasons set out above, we affirm the district court's judgment of conviction but vacate the court's sentence and remand for a new sentencing.

*So ordered.*

---

**10.** The distribution count could conceivably have been grouped with the crack house counts under subsection 3D1.2(b) of the Guidelines as "involv[ing] the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a com-

application note 2 ("'Offenses of a character for which § 3D1.2(d) would require grouping of multiple counts,' as used in subsection (a)(2), applies to offenses for which grouping of counts would be required under § 3D1.2(d) *had the defendant been convicted of multiple counts ....* If the defendant *is* convicted of multiple counts for [such offenses], the grouping rules of Chapter Three, Part D (Multiple Counts) provide that the counts are grouped together.") (emphasis added).

mon scheme or plan," but the district court expressly found the distribution count was not sufficiently related to the others to qualify for grouping thereunder, *see supra* note 7, a finding that is not challenged on appeal.

**11.** The Court initially stated: "I don't believe that [the effect of the delay] qualifies for a departure downward as a fact not adequately considered and that I can consider that as departure grounds...." Sent. Tr. 12. Subsequently, however, the court suggested it declined to depart because any prejudice Lancaster suffered because of the delay was "balance[d] out" by the benefit of being free for many months between expiration of the District sentence and the sentencing hearing. *Id.*