925 So.2d 1117 (2006)
Irvin ASHLEY, Appellant,
v.
STATE of Florida, Appellee.
No. 5D04-2680.
District Court of Appeal of Florida, Fifth District.
April 13, 2006.
*1118 James S. Purdy, Public Defender, and Rosemarie Farrell, Assistant Public Defender, Daytona Beach, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Pamela J. Koller, Assistant Attorney General, Daytona Beach, for Appellee.
GRIFFIN, J.
Irvin Ashley ["Ashley"] appeals an order revoking his community control. Ashley had been convicted of a number of drug offenses and was on probation. On March 16, 2004, he was arrested and charged with violating his probation by committing three new law violations: possession of marijuana, maintaining a drug dwelling, and possession of drug paraphernalia. An evidentiary hearing was held on the violations.
Evidence was presented that some time before March 16, 2004, the police department had received complaints of continuous traffic in and out of a residence at 413 Bronson Street in Palatka. Because of the complaints, Detectives Hagar and Meredith of the Palatka Police Department conducted two trash pulls at the residence within a thirty-day period. In the trash that was confiscated, the detectives found "[c]annabis, baggies, mail, paraphernalia." They also found mail addressed to Ashley, which helped them to identify who was staying at the residence. Detective Hagar was then able to use this information to obtain a search warrant, which he and eight members of an entry team executed around 4:45 a.m. on March 5, 2004.
Detectives Hagar and Meredith testified that they found both cocaine and marijuana when executing the warrant, although none was found on Ashley's person. They went upstairs immediately upon gaining entry to the home and met Ashley coming out of the master bedroom, which he was sharing with his girlfriend. She was found to be in possession of crack cocaine, which she attempted to flush down a toilet when she went to use the restroom. Additional crack cocaine was found in her wallet in the master bedroom. Two men, one of whom was Ashley's stepbrother, Optavis Oliver ["Oliver"], were sleeping on the floor in a second bedroom. No drugs were found in this area. The third bedroom was empty.
Varying amounts of drugs and drug paraphernalia were found in the living areas of the home. In the downstairs living room, in plain sight, some marijuana was found on a T.V. stand. A one gram baggie of cannabis was found on an end table. Also lying on the end table were some of Ashley's personal effects. They included a brochure from his grandmother's funeral, some keys and some photographs. Gramsize plastic baggies were found in the dining room area. In the kitchen, they found two different kinds of scales, one digital *1119 and one metal, and more gram-size plastic baggies.
Outside, a marijuana cigarette was found in the ashtray of a truck belonging to Oliver. Marijuana remains were also found on the floorboards, and there was an odor of marijuana in the vehicle. However, no drugs were found in a second vehicle, which belonged to Ashley.
No evidence was offered by the State that Ashley owned or leased the residence at 413 Bronson Street. Nor was any evidence offered that he was paying rent on the property. Detective Meredith said he did not know who owned the residence or if it was leased. Detective Hagar testified that the house was owned by an unnamed third party. He had attempted to make contact with the owner to determine whether the property was leased, but had been unsuccessful. He said they had also searched utility and other records and came up with several names, but not Ashley's. Detective Hagar did not know what authority Ashley had over the residence, "[o]ther than just we knew that's where he was laying his head every night." He had no idea how long Ashley had been staying at the residence. Detective Meredith testified that he had no knowledge of who had the right to control access to the house, "other than finding mail, and, you know, as far as going on the stuff that was in there, you know, to find out who was staying, who was occupying the house." Detective Meredith said that they had found mail addressed to Ashley at the residence during one of the trash pulls.
Ashley offered the testimony of two witnesses. Oliver, claimed responsibility for the marijuana and baggies found inside the residence and in his vehicle. He claimed that on the night the warrant was executed, he had arrived at the residence after everyone was asleep. He often stayed at the residence, as did a number of other unnamed people. Oliver had smoked some marijuana in his truck and brought some marijuana and some baggies inside. He said that Ashley had told him not to bring any stuff inside his house because Ashley was on community control. Oliver claimed he had already pled guilty to possession of the marijuana and paraphernalia they found in the house.
Ashley himself testified that he moved into 413 Bronson Street on January 5, 2004. He said that the house was also occupied by Mr. Mulberry, "the guy that I moved in with", who was his "cousin's old man." In fact, it was Mr. Mulberry's name on the lease. The warrant was executed approximately two months after Ashley moved in. Ashley testified that before his arrest, he had successfully completed eight and one-half months of drug offender community control, two separate drug classes and a twelve-step narcotics anonymous class. He had never failed any of the random urinalyses which he had taken weekly. Ashley denied knowing of any drugs or drug paraphernalia in the home.
Defense counsel moved for a judgment of acquittal at the close of all the evidence, arguing that the evidence was insufficient to show that Ashley possessed drugs or paraphernalia. He also objected that the evidence was insufficient to show that he had maintained a drug dwelling, as it failed to show that Ashley controlled the residence or had knowledge of the drugs located on the premises.
The trial court agreed that the evidence was insufficient to show that Ashley possessed any of the drugs or paraphernalia found during the search. However, the court found the evidence sufficient to show that Ashley had "maintained a drug dwelling," in violation of section 893.13(7)(a)5, Florida Statutes (2003), which makes it unlawful for any person:
To keep or maintain any store, shop, warehouse, dwelling, building, vehicle, *1120 boat, aircraft, or other structure or place which is resorted to by persons using controlled substances in violation of this chapter for the purpose of using these substances, or which is used for keeping or selling them in violation of this chapter.
Section 893.13(7)(a)5, Florida Statutes (2003), has been interpreted by the Second District Court of Appeal in State v. De La Llana, 693 So.2d 1075 (Fla. 2d DCA 1997), which is the only case to have discussed the elements of the offense. There, the court determined that "keep" means "conduct or manage" and "maintain" means to "carry on." The Second District concluded that the statute could be applied to one acting in a managerial capacity for a business because he has the requisite control over the location. In reaching this conclusion, the court also analogized the offense to the criminal offense of keeping or maintaining a place for the purpose of gambling:
Our conclusion is further buttressed by utilizing the principles of Tingley [v. Brown, 380 So.2d 1289, 1290 (Fla.1980)], and analyzing how the terms "keep" and "maintain" have been construed by an appellate court in the context of another criminal statute, section 849.01, Florida Statutes (1995), which prohibits in part the keeping or maintaining of a place for the purpose of gambling, and which part has remained virtually unchanged since its enactment in 1887. See ch. 3764, § 1, at 145, Laws of Fla. (1887). In Perlman v. State, 269 So.2d 385 (Fla. 4th DCA 1972), the court reviewed the sufficiency of the evidence to sustain a conviction under this part of the statute. It first noted that in order to prove this particular offense the state must establish that a defendant had "ownership or control of a place" where habitual gambling has occurred with the defendant's knowledge, consent, or direction. Id. at 387 (emphasis added). The court further observed that the gravamen of the offense is not gambling as such or habitual use of property for gambling but instead "is the maintenance or keeping of a place for gambling purposes." Id. (emphasis added). Based on this statutory analysis, it affirmed the conviction of one of the appellants relying in part on evidence that he was the manager of the premises. Id. at 388-89; see also Reinmiller v. State, 93 Fla. 462, 111 So. 633 (1927) (affirming conviction of appellant under same part of statute whom evidence established was the manager and operator of premises). Thus, as construed within the context of an analogous criminal statute, the concept of "keep or maintain" contemplates conduct involving control over a place in a managerial capacity.
Id. at 1078-79 (emphasis added).
As De La Llana indicates, the essence of the offense of keeping or maintaining a drug dwelling is not the drug activity, but the maintenance or keeping of a dwelling for the purpose of using, keeping or selling controlled substances. As the dissent notes, this is a "crack house" statute, designed to eliminate the use of structures as destinations for people to visit for the purpose of using or dealing drugs. Not every residence where drugs are used is a crack house. The offense clearly requires proof that the property be maintained for the illicit purposes identified and that the defendant had ownership or control of 413 Bronson Street such that the activity took place at his direction or with his consent. Here, such proof was lacking, even by a preponderance of the evidence.[1]See, e.g., Bufford v. State, 844 So.2d 812 (Fla. 5th DCA 2003).
REVERSED.
*1121 TORPY, J., concurs.
SAWAYA, J., dissents, with opinion.
SAWAYA, J., dissenting.
Having been convicted of numerous drug offenses, Irvin Ashley was placed on community control, which he was subsequently found to have violated by committing the new criminal offense of keeping or maintaining a drug-house in violation of section 893.13(7)(a)5., Florida Statutes (2003). The majority concedes that the trial court correctly held that Ashley knew his house had been resorted to by people using controlled substances. The only reason the majority concludes that Ashley did not keep or maintain a drug-house in violation of section 893.13(7)(a)5. is because the majority believes that the evidence does not establish that he had "ownership or control over 413 Bronson Street," which is the address of Ashley's residence and the location of the alleged criminal conduct. Hence, I will address that issue and explain why I believe that sufficient evidence was presented to the trial court to prove that Ashley did "keep or maintain" a dwelling for drug use in violation of the statute.
In order to establish that an individual on community control or probation violated supervision by committing a new law violation, the state must prove by a preponderance of the evidence that the individual committed the charged offense. Robinson v. State, 907 So.2d 1284, 1287 (Fla. 2d DCA 2005). "Proof by a `preponderance' of the evidence means proof which leads the factfinder to find that the existence of a contested fact is more probable than its nonexistence." Smith v. State, 753 So.2d 703, 704 (Fla. 5th DCA 2000) (citing Dep't of Health & Rehab. Servs. v. M.B., 701 So.2d 1155 (Fla.1997); Walls v. State, 641 So.2d 381 (Fla.1994), cert. denied, 513 U.S. 1130, 115 S.Ct. 943, 130 L.Ed.2d 887 (1995); State v. Edwards, 536 So.2d 288 (Fla. 1st DCA 1988)). "Sufficiency of the evidence is generally an issue of law that should be decided pursuant to the de novo standard of review." Santiago v. State, 874 So.2d 617, 624 (Fla. 5th DCA 2004) (citing Jones v. State, 790 So.2d 1194 (Fla. 1st DCA 2001); State v. Hawkins, 790 So.2d 492 (Fla. 5th DCA 2001)). We must apply a deferential standard of review to claims of insufficiency of the evidence, which requires that we determine "whether, after all conflicts in the evidence and all reasonable inferences therefrom have been resolved in favor of the verdict on appeal, there is substantial, competent evidence to support the verdict and judgment." Tibbs v. State, 397 So.2d 1120, 1123 (Fla.1981), aff'd, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982); see also F.B. v. State, 852 So.2d 226, 230 (Fla.2003). Once we determine that substantial competent evidence supports the finding that a defendant committed a new law violation based on the de novo standard of review, then we apply the abuse of discretion standard to determine whether the trial court erred in determining that the new law violation *1122 constituted a substantial and willful violation that warrants revocation of that defendant's community control or probation. See State v. Carter, 835 So.2d 259, 262 (Fla.2002).
In order to resolve Ashley's claim of insufficient evidence, it is appropriate to first determine the precise nature of the conduct prohibited by Florida's drug-house statute, which makes it unlawful for any person
[t]o keep or maintain any store, shop, warehouse, dwelling, building, vehicle, boat, aircraft, or other structure or place which is resorted to by persons using controlled substances in violation of this chapter for the purpose of using these substances, or which is used for keeping or selling them in violation of this chapter.
§ 893.13(7)(a)5., Fla. Stat. (2003). Inclusion of this statute in chapter 893 of the Florida Statutes reveals that it is part of Florida's comprehensive legislative scheme aimed at prohibiting illegal drug activity.
The issue that must be resolved is whether sufficient evidence was introduced to establish, by a preponderance of the evidence, that Ashley did "keep or maintain" the premises for illegal drug use. Although this is a fact-intensive issue that must be resolved based on all of the evidence presented in each particular case,[1] the words "keep" and "maintain" are not defined in the statute and it is unclear what must be established in order to prove those elements of the offense. While the court in State v. De La Llana, 693 So.2d 1075 (Fla. 2d DCA 1997), did indicate that ownership and control are indicative of keeping or maintaining the premises for illegal drug use, the court was very careful to note that the focus of its decision was the constitutional issue whether the statute was constitutionally void for vagueness. Therefore, the court did not analyze other factors that should or may be considered in arriving at this determination. Although I agree that ownership and control are relevant factors, and that control is a necessary factor, they are not exclusive. Moreover, while I believe that some degree of control of the premises must be proven, that factor alone may not be sufficient in all cases. Because no other Florida court has analyzed the factors that may be considered in making this determination, it is very helpful to turn for guidance to decisions rendered by courts in other jurisdictions that have made that analysis based on statutory provisions similar to section 893.13(7)(a)5.
Congress has enacted a federal statute very similar to section 893.13(7)(a)5. that is commonly referred to as the "crack-house statute." See United States v. Verners, 53 F.3d 291, 295 (10th Cir.1995). It provides in pertinent part as follows:
Except as authorized by this subchapter, it shall be unlawful to ... knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance.
21 U.S.C. § 856(a)(1). The federal courts have analyzed the factors that may be considered in determining whether an individual keeps or maintains premises for illegal drug use pursuant to the federal statute and have concluded that those factors include "[a]cts evidencing such matters as control, duration, acquisition of the site, renting or furnishing the site, repairing the site, supervising, protecting, supplying *1123 food to those at the site, and continuity." United States v. Clavis, 956 F.2d 1079, 1091 (11th Cir.), modified, 977 F.2d 538 (11th Cir.1992); see also United States v. Morgan, 117 F.3d 849, 857 (5th Cir. 1997) (noting some of the factors listed in Clavis and stating that "[s]upervisory control over the premises is one factor that this court has considered probative of `maintaining' a place"); United States v. Cabbell, 35 F.3d 1255, 1261 (8th Cir.1994) (citing Clavis, 956 F.2d at 1091).
When the premises is a residence, the courts consider the fact that the defendant lived on the premises a significant factor in determining whether he or she maintained the premises. In Verners, the court explained:
The first such term is "maintain." In United States v. Williams, [923 F.2d 1397 (10th Cir.1990)] we found that, where the "place" in question is a residence, the defendant must have a "substantial connection" to the home and must be more than a "casual visitor" in order to satisfy this element. 923 F.2d at 1403. Where the defendant lives in the house, this element is normally easily proved. Onick, 889 F.2d at 1431. However, the question of what constitutes "knowingly maintaining" becomes more complicated when the defendant does not reside where the drugs are. This question has been considered by the Eleventh Circuit.
Acts evidencing such matters as control, duration, acquisition of the site, renting or furnishing the site, repairing the site, supervising, protecting, supplying the food to those at the site, and continuity are, of course, evidence of knowingly maintaining the place considered alone or in combination with evidence of distributing from that place.

United States v. Clavis, 956 F.2d 1079, 1091 (11th Cir.), cert. denied sub nom., Edwards v. United States, 504 U.S. 990, 112 S.Ct. 2979, 119 L.Ed.2d 597 (1992).
Verners, 53 F.3d at 295-96. The Cabbell decision presents another example where living on the premises was considered an important factor. In Cabbell, the court considered the sufficiency of the evidence and, after reviewing the evidence in the light most favorable to the government, the court affirmed the conviction under the crack-house statute, writing:
Craig argues that the government did not produce evidence that he knowingly maintained the premises. We disagree. The evidence showed that Craig lived at Eddie Cabbell's house and the Budget Hotel and paid rent to both with cocaine base and cash. In determining whether a person knowingly maintains a premises, "renting or furnishing the site" are relevant factors to consider. United States v. Clavis, 956 F.2d 1079, 1091 (11th Cir.1992), cert. denied, 507 U.S. 998, 113 S.Ct. 1619, 123 L.Ed.2d 178 (1993). Moreover, the jury could have inferred that Craig "maintained the house because he lived there." United States v. Onick, 889 F.2d 1425, 1431 (5th Cir.1989). Based on the evidence, the district court did not err in holding that Craig maintained the premises.
Cabbell, 35 F.3d at 1261 (footnote omitted). In United States v. Lewis, 191 F.3d 461 (9th Cir.1999) (unpublished opinion available at 1999 WL 691041), the court held that the element of "maintain" was established beyond a reasonable doubt and explained:
Lewis argues there was insufficient evidence to prove that she was maintaining a place for drug trafficking. To prove this crime, the government must show that Lewis (1) knowingly (2) opened or maintained a place (3) for the purpose of manufacturing, distributing or using a controlled substance. See 21 *1124 U.S.C. § 856(a)(1); United States v. Basinger, 60 F.3d 1400, 1404 (9th Cir.1995).
As explained above, there was sufficient evidence to infer that Lewis knew about the distribution of drugs taking place at the apartment. Lewis's only argument is that a reasonable jury could not have found that she maintained the apartment because there was no proof that she had dominion or control over the apartment. We disagree. From the large amounts of drugs, drug paraphernalia and money in the apartment, the jury could reasonably infer that the apartment was being used for distributing drugs. Lewis was one of two people living at the apartment and as explained above there was sufficient evidence to prove that she was selling drugs from the apartment. Based on these facts, a reasonable jury could have inferred that Lewis was maintaining the apartment for the purpose of dealing drugs. See Basinger, 60 F.3d at 1405-06.
Lewis, 1999 WL 691041, at *1.
Other factors were considered by the court in Morgan in determining whether the premises were maintained as a crack-house under the federal statute. The court analyzed the evidence presented to determine whether the defendant maintained a crack-house and concluded:
With this background in mind, we turn to whether there was sufficient evidence that Wright maintained the apartment on School Place. On one hand, the record is devoid of evidence that Wright lived at the apartment, leased the apartment, paid rent for the apartment, had such control over the apartment that he could lend it to others, or that the utilities or telephone service were in his name.
....
This case does not involve an isolated sale of crack from a location. Rather, all the evidence is consistent with Wright having participated in the maintenance of a crackhouse. Wright directed others to the crackhouse; called the location "our spot"; told Officer Webster that Cherry, who resided in the apartment, worked for him; and exercised dominion and control over the apartment by directing another person during a drug transaction and by storing his drugs in a closet in the apartment. Although any of these facts might be insufficient in isolation, they coalesce to support the jury's finding here that Wright maintained 2939 School Place for the purpose of distributing crack cocaine in violation of Section 856(a)(1).
Morgan, 117 F.3d at 857. Similarly, in United States v. Scull, 321 F.3d 1270 (10th Cir.2003), which, like the instant case, involved evidence obtained from a trash pull, the court reviewed the evidence in the light most favorable to the government and concluded it was sufficient to affirm the conviction. The court explained:
Mr. Scull also contends the government failed to prove he maintained a place for manufacturing and distributing cocaine. In order to convict a defendant of this charge, the prosecution must "prove that [the defendant] (1) knowingly (2) opened or maintained a place (3) for the purpose of manufacturing a controlled substance." United States v. Higgins, 282 F.3d 1261, 1276 (10th Cir. 2002). Based on the evidence already cited in this opinion, Mr. Scull's claim fails. Evidence obtained from the trash pulled from Mr. Scull's home indicated drugs were being manufactured there. Drying and packaged crack cocaine were found in Mr. Scull's home. Mr. Scull's co-conspirators were seen coming to and from his home in the course of completing drug sales. Taking the evidence with all the reasonable inferences to be drawn therefrom most favorably to the government, the evidence was sufficient *1125 to warrant Mr. Scull's guilty verdict for maintaining a place for the manufacture and distribution of drugs.
Id. at 1284.
Decisions from state courts in other jurisdictions also rely on various factors to determine whether an individual keeps or maintains premises utilized as a place for illegal drug use. In State v. Kelly, 120 N.C.App. 821, 463 S.E.2d 812 (1995), for example, the court affirmed a conviction for maintaining a dwelling house for drugs under a statute almost identical to Florida's section 893.13(7)(a)5. The North Carolina statute made it unlawful for any person
[t]o knowingly keep or maintain any store, shop, warehouse, dwelling house, building, vehicle, boat, aircraft, or any place whatever, which is resorted to by persons using controlled substances in violation of this Article for the purpose of using such substances, or which is used for the keeping or selling of the same in violation of this Article....
N.C.G.S. § 90-108(a)(7) (1993). The court found the following evidence sufficient beyond a reasonable doubt to convict the defendant of violating this statute:
Defendant Gardner also argues that the trial court erred in denying his motion to dismiss and set aside the jury verdict for the charge of intentionally keeping and maintaining a dwelling for the purpose of using, keeping, or selling controlled substances. N.C.G.S. § 90-108(a)(7) (1993). Defendant Gardner contends there was insufficient evidence to support this charge.
The record shows that defendant possessed a key to the house at 1225 Jamestown Court and used it to go in and out of the house. Inside the house, in the upstairs master bedroom, a letter from Integon Insurance was found addressed to defendant at 1225 Jamestown Court. Scales and baking soda, items commonly used to cut and package cocaine, were located in the kitchen of the house. Potpourri similar to that found in the package containing cocaine was also found in a ziplock bag in the home. The package was addressed to Randy Brown, and defendant stated that he was Randy Brown when asked by an undercover officer. Defendant also listed 1225 Jamestown Court as his address after he was arrested.
Although this evidence is not overwhelming, a reasonable person could infer from the evidence that defendant was in control of and maintained the residence for drug activities.
Kelly, 463 S.E.2d at 815.
All of these cases clearly establish that there are numerous factors that should be considered in determining whether an individual keeps or maintains premises for illegal drug use. They are also significant in that each presents facts and circumstances very similar to the facts established by the evidence presented in the instant case. The factors established by a preponderance of the evidence presented in the instant case certainly support the trial court's conclusion that it was more probable than not that Ashley did "keep or maintain" a residence for illegal drug use in violation of section 893.13(7)(a)5. Specifically, I believe that the factor of control of the premises, which I have previously indicated is a necessary factor to prove maintenance under section 893.13(7)(a)5., is clearly established.
The evidence reveals that the police department received numerous complaints from Ashley's neighbors for a period of a month to a month-and-a-half about continuous traffic in and out of the residence where Ashley lived. The police conducted two trash pulls from the residence and discovered cannabis, baggies, mail addressed to Ashley, and other paraphernalia. *1126 Armed with this information, the police obtained a search warrant that was executed on March 5, 2004. When the police entered the residence, they found Ashley and his girlfriend upstairs. Although two other occupants were located in another bedroom, Ashley was the only permanent resident in the house. Ashley's girlfriend was found to be in possession of cocaine, some of which she tried to flush down the toilet. In the living room, in plain view, the police found cannabis on the television stand. A one-gram baggie containing cannabis was discovered next to some of Ashley's personal items on an end table. Other one-gram baggies were discovered in the dining room area and in the kitchen. Two scales used for weighing drugs were also found in the kitchen, as was mail addressed to Ashley. The police also recovered $1,900 in cash from Ashley. Not only does the evidence establish that Ashley lived on the premises, it also shows that Ashley gave permission for his brother to move in and stay. Further, according to Ashley's own testimony, Ashley ordered his brother not to bring drugs into the house and he issued the same edict to his own girlfriend when he allowed her to stay overnight.
The majority suggests, albeit in a footnote, that Ashley's exercise of control over his residence by telling his girlfriend and brother not to bring drugs into his house implies that he may not have been utilizing his residence for the purpose of illegal drug use.[2] This suggestion is obviously relegated to a footnote because, as I previously mentioned, the majority concedes in its opinion that the trial court correctly ruled that Ashley knew that his house was being resorted to by people using controlled substances. The majority properly makes this concession for the following reason: with drugs and paraphernalia (including drug scales) strewn throughout the house, cocaine on the person of his girlfriend with whom Ashley shared a bedroom, drugs found in Ashley's trash, and numerous complaints from neighbors about the comings and goings of individuals to and from Ashley's residence at all hours of the day and night, not even Ashley argued that the residence was not utilized for the purpose of illegal drug use. Moreover, if anyone knew what was going on in his house it was Ashley because as a condition of his community control supervision, Ashley was confined to that residence and could not leave unless authorized by his community control officer. Despite the fact that the only permanent resident of the house found by the police was Ashley, Ashley's only defense as presented, rather inarticulately, to the trial court during closing argument by Ashley's attorney was that Ashley "was just a man up there asleep in bed when the cops came in and found somebody else had brought stuff in there in a house that there's been no evidence that he had authority to control any of the ingoings and outgoings at any time of [sic]." As for Ashley's girlfriend, although *1127 Ashley testified that he did not know she had possession of cocaine the night he was arrested, the trial court specifically found that testimony was not credible. Clearly Ashley knew that she had possession of cocaine the night he was arrested and the fact that she was allowed to bring drugs into his residence at that time shows, at least to me, that he exercised control over the residence and the flow of drugs in and out of it.
Drawing all reasonable inferences from the evidence in favor of the trial court's decision, as we must, it makes little sense to me to suggest that a person does not control the residence he lives in when he is confined there as a condition of community control, allows people to stay there that he knows utilize the residence for illegal drug use, allows drugs and paraphernalia into his house and permits it to be strewn about in various rooms, directs when individuals may and may not bring drugs into his house, and is the only permanent resident the police find in the house. I firmly believe that there is competent substantial evidence to establish that Ashley controlled his residence. In addition to control, other factors sufficiently established by the evidence include duration, acquisition of the premises as a residence, continuity, and a degree of supervision of those allowed by Ashley to stay on the premises. In my view, these factors clearly show that Ashley kept or maintained the premises under section 893.13(7)(a)5.
The majority emphasizes that there was no evidence that Ashley owned or leased the premises. Unlike the majority, I do not believe that ownership or even a leasehold interest are necessary ingredients, and I agree with the decisions previously discussed that say so as a matter of law. See Morgan, 117 F.3d at 857-58 ("Drug dealers who maintain a location for the purpose of selling drugs may not avoid conviction under the crackhouse statute by simply ensuring that the lease or deed for the location and the utilities, if any, are not in their name.") (citing United States v. Wood, 57 F.3d 913, 919 (10th Cir.1995); United States v. Howell, 31 F.3d 740, 741 (8th Cir.1994); United States v. Lancaster, 968 F.2d 1250, 1254 (D.C.Cir.1992)). In my view, and as the cases I have discussed indicate, it makes little sense to suggest that an individual who keeps or maintains a drug-house will find it beneficial to reveal his or her involvement in the crime by placing his or her name on a deed or lease of the premises where illegal drugs are used.
Moreover, the majority seems to discount the fact that Ashley lived on the premises. I believe, in accordance with the cases I have discussed, the fact that Ashley lived on the premises is a significant factor that should be considered in determining whether he kept or maintained the premises. Indeed, as previously mentioned, standard conditions of community control supervision require that the defendant maintain a residence, that the defendant notify his or her probation officer of the address, and that the defendant remain at that location and allow supervisory visits in the home. See § 948.101(a)(2), Fla. Stat. (2004); see also Fisher v. State, 778 So.2d 437 (Fla. 5th DCA 2001) (holding that a willful and substantial violation of community control occurred when defendant failed to remain confined to his residence).
I also note that living on the premises is a significant factor in other statutory contexts where "keep or maintain" is an element the state must establish in order to prove a violation of the particular statute. In Polston v. State, 137 So.2d 602 (Fla. 2d DCA 1962), for example, the court held:
The defendant contends next that the evidence did not sufficiently establish that he did keep or maintain the kind of *1128 place condemned in Sec. 568.04, Fla. Stat., 1959, F.S.A., which reads as follows:
"It is unlawful for anyone to keep or maintain a place where intoxicating liquors, wines or beer are sold in any county that has voted against the sale of intoxicating liquors, wines or beer."
In the trial of this case the defendant testified that he lived at the place in question and that he had allowed his brother-in-law, Scranton, to live in the smaller house just to the rear of the defendant's house. He further testified that he knew that Scranton was selling liquor in the smaller house. The witnesses for the state all testified that intoxicating liquor was sold on the premises of the defendant. From the record there is no question that a jury could find that the defendant's control over the premises was sufficient to establish beyond a reasonable doubt that he did `keep and maintain a place' of the variety condemned by Sec. 568.04, supra.
Id. at 604.
The majority makes a point of disclosing that while the police found both cocaine and marijuana in Ashley's residence when executing the warrant, "none was found on Ashley's person." But undisclosed by the majority is the obvious reason no drugs were found on Ashley's personhe was found by the police naked exiting a bedroom he shared with his girlfriend who, as previously indicated, was found in possession of cocaine which she subsequently attempted to flush down a toilet.
Based on the relevant factors that determine whether an individual keeps or maintains a residence as a drug-house and after all conflicts in the evidence and all reasonable inferences therefrom have been resolved in favor of the trial court's decision, I believe that there is substantial competent evidence to establish by a preponderance of the evidence that Ashley did violate section 893.13(7)(a)5. Having properly found the new violation was committed, the trial court did not abuse its discretion in revoking Ashley's community control.
I conclude my discussion with the following observation: having discussed numerous cases from other jurisdictions that considered the issue we now consider based on statutory provisions very similar to section 893.13(7)(a)5., I find it quite remarkable that, based on less evidence or evidence markedly similar to that considered by the trial court in the instant case, those courts held that the government proved beyond a reasonable doubt that the defendant did keep or maintain the premises as a drug-house. In the final analysis, I think the majority has failed to properly evaluate the evidence in the instant case and has heaped upon the preponderance of the evidence standard far too much extra weight, thereby imposing on the State a standard more burdensome than proof beyond a reasonable doubt. Accordingly, I respectfully dissent.
NOTES
[1] There is much in the dissent to agree with; however, most of the federal cases cited involve some evidence of sale or distribution of drugs by the defendant and establish control for the purpose of sale or use of drugs. Here, there is no proof of any legal right to control the premises and limited proof of Ashley's (apparently ineffective) efforts as a resident to control the activities occurring there. There is no proof that Ashley possessed any drugs on the premises or otherwise, no direct evidence he knew drugs were present and there is certainly no evidence that he maintained the premises for the purpose of drug sales or use. In fact, the evidence of "control" relied on by the dissent is that Ashley told his brother and girlfriend not to bring drugs onto the premises. This fact is either true for both "control" and for "purpose," or for neither. If taken as true, the dissent is correct that it is some evidence of control; however, it negates the notion that the purpose of maintaining the residence was sale or use of drugs.
[1] See United States v. Morgan, 117 F.3d 849, 857 (5th Cir.1997) ("We emphasize that whether a defendant has `maintained' a place is necessarily a fact-intensive issue that must be resolved on a case-by-case basis. In doing so, we must be mindful of the conditions under which crackhouse operations are often conducted.").
[2] In the same footnote, the majority asserts that there is no evidence that Ashley maintained his residence for the purposes of drug sales. But evidence of drug sales is not necessary to establish a violation of section 893.13(7)(a)5. All that is necessary is that Ashley keep or maintain his residence for the purpose of using controlled substances. This is what Ashley was accused of doing and this is what the State proved by a preponderance of the evidence. I also reject the majority's contention that in the federal cases I have discussed, control was established because there was evidence of drug sales. Those cases deal with instances where a defendant was criminally charged with using or maintaining premises for the purpose of "manufacturing, distributing, or using any controlled substance." 21 U.S.C. § 856(a)(1) (emphasis added). Those cases are directly on point and address the very issue that is before us in the instant case. Unlike the majority, I find them very persuasive.